2008 UT 68

**Curtis J. BELLER, Petitioner, Appellant, and Cross–Appellee,**

**v.**

**Nannette ROLFE, Director, Utah State Driver License Division, Respondent, Appellee, and Cross–Appellant.**

No. 20060641.

Supreme Court of Utah.

Sept. 19, 2008.

Ronald J. Yengich, Elizabeth Hunt, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Rebecca D. Waldron, Asst. Att'y Gen., Annina M. Mitchell, Salt Lake City, for respondent.

NEHRING, Justice:

¶ 1 In this appeal we take up the question of whether the exclusionary rule applies to driver license suspension proceedings. We hold that it does not. Curtis Beller, whom police stopped on noise and light ordinance violations and subsequently arrested for operating his motorcycle while under the influence of alcohol, challenges the loss of his driving privileges. Mr. Beller contends that law enforcement lacked a sufficient justification to stop him, and therefore, the exclusionary rule should bar the State from admitting in proceedings before the Utah Driver License Division any evidence obtained pursuant to the search. We hold that the exclusionary rule does not apply to driver license suspension and revocation proceedings and therefore affirm.

## FACTS

¶ 2 Just after midnight, Salt Lake City Police Officer Jeff Kendrick, who was stopped on the side of the road, noticed two motorcycles as they passed on the opposite side of the street. Officer Kendrick, who was a motorcycle officer and familiar with motorcycles, noted that the sound coming from one of the motorcycle's mufflers was "extremely loud" and that blue lights illuminated the engine. Although Officer Kendrick did not know the make or model of the passing motorcycle, he noted that the noise it emitted was "loud enough that you could hear [it], you know, a block away, and that's not typical of a regular stock equipped muffler on a Harley Davidson." At first, he decided not to follow the two motorcycles because he did not want to leave his partner. His partner was a new officer, whom Officer Kendrick was helping to train, and who was involved at the time in an unrelated traffic stop.

¶ 3 A few minutes later, the motorcycles passed again. This time they approached on the side of the street where Officer Kendrick was situated. One of the motorcycles came so close to the two officers that Officer Kendrick said he was concerned about his safety. He then decided to follow the two motorcycles.

¶ 4 Based on his observations and previous experience, Officer Kendrick thought that the loud motorcycle likely violated Salt Lake City Ordinance 12.28.100, which prohibits an individual from operating a motorcycle with a muffler system that has been modified or replaced in order to make the emitted sound louder. He also thought that the blue lights coming from the engine likely violated Salt Lake City Ordinance 12.28.090, which prohibits an individual from operating a vehicle with excessive lighting equipment. Officer Kendrick followed the two motorcycles and, when he caught up to them at an intersection, instructed them to pull over. They complied.

¶ 5 When Officer Kendrick approached the motorcyclists, he noticed one of them, Curtis Beller, smelled of alcohol. Mr. Beller stipulated as much at his revocation hearing. Officer Kendrick also noticed that Mr. Beller displayed bloodshot eyes and relaxed facial features. After Mr. Beller admitted he had been drinking earlier that evening, Officer Kendrick requested Mr. Beller to perform field sobriety tests. Mr. Beller agreed to perform the tests but failed them. When Mr. Beller also failed the portable breath test, he was arrested for driving under the influence of alcohol. Officer Kendrick gave Mr. Beller notice of the Division's intention to suspend his license.

¶ 6 Mr. Beller requested an administrative hearing before the Division to challenge the suspension. After his efforts failed to persuade the Division not to suspend his license, Mr. Beller filed a petition for review by trial de novo in the district court. At that hearing, Mr. Beller argued that Officer Kendrick lacked reasonable suspicion that Mr. Beller had committed a traffic offense and therefore had no lawful reason to stop him. Mr. Beller further argued that because the detention was constitutionally unreasonable in accordance with the exclusionary rule, "his driver's license [should] be reinstated accordingly."

¶ 7 The district court disagreed. Although the court found that Officer Kendrick lacked reasonable suspicion to initiate the stop, it ruled that the exclusionary rule did not apply to Mr. Beller's driver license hearing, which it determined to be remedial in nature rather than quasi-criminal. Mr. Beller and the State appealed. The Utah Court of Appeals certified the case to this court for determination. We now affirm.

## ARGUMENT

¶ 8 The parties ask us to consider several arguments on appeal. First, the State argues that Mr. Beller waived his right to argue that the exclusionary rule applied to his driver license hearing because he failed to raise the issue before the Division in his initial administrative hearing. Mr. Beller counters that, for essentially the same reasons, the State waived its right to argue that the exclusionary rule did not apply. Second, assuming the parties did not waive the issue, they ask us to consider the underlying merits of their arguments regarding the exclusionary rule's application. Finally, the parties ask us to consider whether the district court erred in concluding that Officer Kendrick violated the Fourth Amendment by stopping Mr. Beller without reasonable suspicion. We will address each of these arguments in turn.

## I.  NO WAIVER OCCURRED

¶ 9 Because Mr. Beller received a trial de novo, we need not determine whether he (or the State) waived the issue of whether the exclusionary rule applies. Individuals whose driver licenses have been revoked are entitled to seek judicial review. Utah Code Ann. § 41–6a–521(6) (Supp.2008); *id.* § 53–3–224 (2007). Utah's Administrative Procedures Act extends to district courts the jurisdiction to review these agency decisions by "trial de novo." *Id.* § 63G–4–402 (Supp. 2008).[1] Although, as we have previously stated, the term "de novo" literally means " 'anew, afresh, a second time,' " we are aware that the term is often imprecisely used. *Bernat v. Allphin,* 2005 UT 1, ¶ 30, 106 P.3d 707 (quoting *Pledger v. Cox,* 626 P.2d 415, 416 (Utah 1981)). Trial de novo can refer to either a complete retrial upon new evidence or a trial upon the record made by a lower tribunal. The proper meaning largely depends on the context in which it is used. *Id.* ¶¶ 30, 31.

¶ 10 As we previously indicated, Mr. Beller petitioned for and received a trial de novo before the district court. As the record in this case aptly reflects, Mr. Beller's trial de novo provided an opportunity to present new evidence. Because Mr. Beller had the opportunity to present new evidence in what was a complete repeat of the prior proceeding, he also enjoyed the opportunity to present new legal arguments—regardless of whether he had raised them at the administrative hearing. And since Mr. Beller had the chance to present new arguments before the district court, the State could as well. Therefore, neither party waived the issue of whether the exclusionary rule applied by failing to argue it before the Division.

## II.  THE EXCLUSIONARY RULE DOES NOT APPLY

¶ 11 The exclusionary rule is a judicially created remedy designed to safeguard the rights created by the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures. One of the central objectives of the rule is to deter those who would defy the mandate of the Fourth Amendment. The exclusionary

---

1.  The Administrative Procedures Act was renumbered in 2008; since substantive changes were not made to the Act, we cite to the newly numbered section.

rule makes evidence inadmissible in certain proceedings if law enforcement obtained that evidence in violation of constitutional or statutory protections. *State v. Topanotes,* 2003 UT 30, ¶ 13, 76 P.3d 1159; *see also Arizona v. Evans,* 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Considering that the exclusionary rule is a judicial construct without a constitutional pedigree, courts have clear authority to decide whether the rule should apply to a particular fact scenario or proceeding. This case calls on us to decide whether Mr. Beller's arrest is such a fact scenario and whether a driver license revocation hearing is such a proceeding.[2] We conclude that the exclusionary rule is not applicable to either one.

■ ¶ 12 To determine whether the exclusionary rule applies in noncriminal proceedings such as a driver license revocation hearing, we consider whether the policy objectives of the rule are served by applying it to the proceeding at issue. Our experience with defining the scope of the rule's applicability serves us well here by describing a continuum on which we can plot a proper place for Mr. Beller's case. On one end, we find *Sims v. Collection Division of the Utah Tax Commission,* 841 P.2d 6 (Utah 1992). We held in *Sims* that the exclusionary rule applied because the proceedings involved the assessment of a tax that was primarily designed to punish. To hold otherwise, we decided, would have ignored the true quasi-criminal nature of the proceeding. *Id.* at 14–15. On the other end, we find *State ex rel. A.R. v. C.R. (In re A.R.),* 1999 UT 43, 982 P.2d 73 (1999). There, we concluded that the exclusionary rule did not apply because the child protection proceedings at issue were primarily intended to protect the interests of children and were not predominately criminal in nature. Application of the rule here, we concluded, would further neither the objectives of the rule nor Utah's child protection laws. To help understand where driver license revocation appeal hearings fall on our analytic continuum, we will look more closely at *Sims* and *In re A.R.*

¶ 13 We *first* turn our attention to *Sims.* Law enforcement officers stopped Louie Sims at a roadblock and, after noticing an open container of alcohol on the backseat, conducted a search of the vehicle. They discovered marijuana and cocaine. Utah's Illegal Drug Stamp Tax Act required that any individual transporting illegal drugs into the state pay a tax and affix a tax stamp to the goods. *Sims,* 841 P.2d at 7. Mr. Sims had not paid the tax or affixed the requisite stamp.

¶ 14 After being arrested for driving under the influence of alcohol and possession of a controlled substance with intent to distribute, Mr. Sims was served with a notice and demand for payment of the tax and a corresponding penalty, totaling nearly $400,000. Mr. Sims filed a petition for redetermination in which he argued that because the roadblock was unconstitutional, the evidence seized pursuant to it should be excluded from the proceeding before the Commission. Without addressing the constitutionality of the stop, the Commission concluded that the exclusionary rule did not apply and that the seized evidence was admissible. *Id.* at 7. We disagreed.

¶ 15 After an extensive analysis that led us to the conclusion that the roadblock itself was unconstitutional, we held that the exclusionary rule applied to proceedings conducted pursuant to the Act "based on the reasoning that illegally obtained evidence should be excluded from a civil proceeding if the proceeding is in effect criminal or if the exclusion is necessary to deter future unconstitutional searches." *Id.* at 13. We concluded that "[w]here the aims and objectives of a civil penalty are closely aligned with those of the criminal law, ... the protections afforded by the criminal law ought to be extended to the quasi-criminal proceeding." *Id.*

¶ 16 We offered several reasons why the Illegal Drug Stamp Tax Act was quasi-criminal in purpose. First, the Act shared the

---

**2.** Although the exclusionary rule finds its origins in federal jurisprudence, the rule independently exists under Utah state law as well. Utah's exclusionary rule "permits us to benefit from federal analysis without being bound by it in our construction of the Utah Constitution." *Sims v. Collection Div. of the Utah State Tax Comm'n,* 841 P.2d 6, 11 (Utah 1992).

criminal law's objective of punishing and deterring those in possession of illegal drugs. *Id.* Second, the Act's assessment scheme and penalty provisions imposed "onerous" financial burdens, which betrayed that it was designed as a tool for punishment and enforcement rather than revenue collection. *Id.* Finally, we noted that enforcement of the Act was "inextricably connected with proof of criminal activity." *Id.* at 14.

¶ 17 We also reasoned that application of the exclusionary rule furthered the rule's purpose of "ensuring restraint by law enforcement officials in connection with the Act." *Id.* The Act contained a provision that allowed the law enforcement agency responsible for the investigation to retain sixty percent of the collected taxes, interests, and penalties. We noted, "In view of the financial motivation given to local law enforcement agencies to acquire evidence of tax violations, the application of the exclusionary rule to drug stamp tax proceedings is likely to provide a significant and substantial additional deterrent to unconstitutional seizures." *Id.*

¶ 18 At the other end of the exclusionary rule continuum lies *In re A.R.*, 1999 UT 43, 982 P.2d 73. There, we considered the application of the exclusionary rule to a civil child protection proceeding. *Id.* ¶ 9. One winter night, a probation officer and a social worker discovered two of the petitioner's children playing unattended in the street outside of the petitioner's house. After questioning the children about their mother's whereabouts and learning that they had not seen her for at least a day, the probation officer called the Salt Lake City Police Department. *Id.* ¶ 3.

¶ 19 When the responding officer arrived at the scene, he tried to locate the mother's boyfriend, who had apparently been entrusted with watching the children. After knocking on the mother's door and not receiving an answer, the officer entered the house "to try and determine if there was anyone there, . . . to have a look around and see what the living conditions were like, [and] to see if anyone was present to watch the children." *Id.* ¶ 4 (internal quotations omitted). The officer then looked in the bedroom and saw, in plain view, two pipes that had been used for smoking drugs. After the officer reported what

he had found, a drug canine unit responded and conducted a more comprehensive search of the house, which uncovered various "sexual devices." Although police officers remained at the scene until about 11:00 p.m., no one ever appeared with the intention of attending to the needs of the children. *Id.* ¶ 5.

¶ 20 The children were placed in shelter care, and the state filed a petition alleging that they had been neglected. As support for this contention, the state cited the evidence of drug paraphernalia and sexual devices uncovered pursuant to the warrantless searches. *Id.* ¶ 6. The mother argued that the searches were invalid and moved to suppress the evidence under the exclusionary rule. *Id.* ¶ 7. Both the juvenile court and the court of appeals concluded that the exclusionary rule did not apply. We agreed and focused our analysis on the exclusionary rule under the United States Constitution. *Id.* ¶ 22.

¶ 21 Our analysis in *In re A.R.* applied the same principles we used in *Sims* but with a different result. We concluded that, unlike the statutory framework in *Sims*, the purpose of child protection proceedings is not punishment. Instead, as we noted,

> The primary focus of and sole statutory justification for child protection proceedings is to protect the interests of children who are neglected or abused. . . . Although parents may suffer a severe detriment in losing temporary or permanent custody of their children, punishment of the parents is not the purpose of the proceeding. . . . In most cases, the primary objective is to effectuate a family treatment plan that will allow children to be returned to their parents. In such cases, state intervention is designed to benefit parents in the long run.

*Id.* ¶ 18 (citations omitted). We further observed that the juvenile court told the petitioner,

> I want to make sure you're clean and sober and . . . I am interested in getting these kids back to you. I'm not interested in keeping these kids away from you. . . . So [DCFS] is going to put together a plan which is going to require . . . certain

changes be made so that those kids have a shot at some success in life.

*Id.* (alteration in original).

¶ 22 As a second justification for our holding, we concluded that the principles behind the exclusionary rule were at odds with the purpose of child protection proceedings. When confronting evidence that points to child abuse or neglect, law enforcement officers are not acting with the "object of obtaining evidence for criminal prosecution." *Id.* ¶ 20. Rather, they are responding to very real emergencies involving the welfare of children and have "little incentive" to violate the Fourth Amendment. *Id.* More importantly, we concluded, "Whatever deterrent effect there might be is far outweighed by the need to provide for the safety and health of children in peril." *Id.* ¶ 21.

■ ¶ 23 Armed with the precedent of *Sims* and *In re A.R.*, we turn our attention to Mr. Beller's case. We conclude that the exclusionary rule does not apply to driver license revocation proceedings because of the character of the proceedings and the fact that application of the rule would be both unnecessary and counterproductive.

¶ 24 By keeping inebriated drivers off the roads, suspension and revocation proceedings serve the important policy function of disabling individuals who might put themselves and other citizens at risk. Such proceedings, which aim to protect rather than to punish, differ substantially from the objectives of the criminal law proscription against operating a motor vehicle while impaired.

¶ 25 We adopted this characterization of driver license proceedings almost three decades ago in *Ballard v. Utah Motor Vehicle Divison*, 595 P.2d 1302, 1305 (Utah 1979). After Roger Ballard lost his license for driving under the influence, he argued that driver license revocation proceedings were quasi-criminal and, thus, that he had been inappropriately denied the procedural due process protections typically available to a criminal defendant. We disagreed.

¶ 26 Although we admitted "that the right to drive is a valuable right or privilege and it cannot be taken away without procedural due process, we [did] not agree that revocation proceedings are therefore necessarily criminal or quasi-criminal in nature." *Id.* at 1304 (footnotes omitted). Summarizing the "generally similar" guidance from other jurisdictions, we said that "[t]he purpose of this administrative procedure is not to punish the inebriated drivers; such persons are subject to separate criminal prosecution for the purpose of punishment. The administrative revocation proceedings [exist] to protect the public, not to punish individual drivers." *Id.* at 1305.

¶ 27 We see no reason to depart from *Ballard*, especially in light of the statutory language that governs driver license suspension and revocation proceedings. The Utah Legislature plainly stated that "the purpose of this title relating to suspension or revocation of a person's license or privilege to drive a motor vehicle . . . while [driving] under the influence . . . is protecting persons on highways by quickly removing from the highways those persons who have shown they are safety hazards." Utah Code Ann. § 53–3–222 (2007).

¶ 28 Other relevant statutory provisions confirm the Legislature's stated purpose. The Division may suspend or revoke driver licenses for up to two years based on the number and nature of any prior convictions for driving under the influence or to otherwise "remove from the highways those persons who have shown they are safety hazards." *Id.* § 41–6a–509(2)(a)(i) (2005).

¶ 29 Section 41–6a–509(3) reinforces the prophylactic purpose of license revocation proceedings. Under this provision, the Division shall suspend an individual's license for an additional period of time upon notice that the individual failed to

(i) complete all court ordered:

   (A) screening;

   (B) assessment;

   (C) educational series;

   (D) substance abuse treatment; and

   (E) hours of work in a compensatory-service work program; or

(ii) pay all fines and fees, including fees for restitution and treatment costs.

*Id.* § 41–6a–509(3)(a).

¶ 30 Viewed in its entirety, this provision demonstrates the value that the Legislature places on attempting to rehabilitate individuals who have driven while under the influence through education, treatment, and public service, such that disabling them their right to drive is no longer necessary.

¶ 31 We further conclude that the principles supporting the existence of the exclusionary rule do not apply in any compelling manner to driver license revocation proceedings. We next consider the exclusionary rule's deterrent objectives against the social benefits that may be achieved through the use of the fruits of an unlawful search.

¶ 32 Law enforcement officers respond to real emergencies when confronting the possibility of impaired drivers, emergencies that implicate the health, safety, and lives of many innocent individuals as they travel on Utah's roadways. In order to effectively respond to these emergencies and disable impaired drivers, law enforcement officers must act quickly and might not always comply with all necessary constitutional and statutory considerations. We conclude, however, as in *In re A.R.*, that the need to protect society from the often deadly effects caused by impaired drivers far outweighs whatever deterrent effect might exist in applying the exclusionary rule.

¶ 33 Moreover, as the Arizona Court of Appeals persuasively reasoned, a deterrent effect specifically for purposes of driver license revocation proceedings is unnecessary.

> When a law enforcement officer stops a motorist on suspicion of DUI, the officer's primary interest is most likely criminal prosecution, rather than the collateral consequence of license suspension. Because use in the license suspension hearing of evidence obtained through an improper stop falls outside the offending officer's zone of primary interest, exclusion of such evidence in that civil context would not significantly affect a police officer's motivation in conducting a vehicle stop. The officer is already punished by the exclusion

of the evidence in the state criminal trial[, which] necessarily, is of substantial concern to him [or her].

> Thus, exclusion of evidence from the license suspension hearing would have little deterrent value as compared to the benefit of having otherwise reliable evidence that a motorist has been driving while intoxicated....
>
> ....
>
> The record does not reflect, nor are we aware of, any cases or statistical studies that suggest a pattern of police misconduct with respect to DUI stops. The prospect of officers knowingly stopping vehicles, without reasonable suspicion of criminal activity, for the purpose of seeking to suspend motorists' driver's licenses if they refuse to submit to ... testing is remote at best.... Consequently, it strikes us as extremely unlikely that officers would use such tactics merely with the hope of obtaining license suspensions, knowing that evidence of intoxication obtained from such an encounter would be inadmissible in any criminal DUI prosecution and that clearly impermissible police conduct could subject officers to civil liability.

*Tornabene v. Bonine ex rel. Ariz. Highway Dep't,* 203 Ariz. 326, 54 P.3d 355, 364–66 (Ct.App.2002) (alterations in original) (citations and internal quotations omitted). Accordingly, we hold that the exclusionary rule does not apply to driver license revocation proceedings.

### III. REASONABLE SUSPICION

¶ 34 Finally, we turn to the issue of the validity of the underlying traffic stop. The State contends that, given the district court's determinative ruling that the exclusionary rule did not apply, it should not have considered the underlying constitutional issue of the validity of the stop. Because we conclude that the exclusionary rule does not apply, we decline to consider whether the district court erred in concluding that "from a totality of the circumstances ... Officer Kendrick lacked reasonable suspicion that [Mr. Beller] was violating the law." Considering the merits of this argument is not necessary for the disposition of this case.

## CONCLUSION

¶ 35 We hold that neither party waived the issue of whether the exclusionary rule applies by failing to raise the issue before the Division. We also hold that the exclusionary rule does not apply to driver license revocation hearings and that because it does not apply, we do not need to address whether the stop was supported by reasonable suspicion. We therefore affirm the holding of the district court.

¶ 36 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING'S opinion.