Opinion by Judge J. JONES.
¶ 1 Respondent, the Colorado Department of Revenue (Department), revoked the driver's license of petitioner, Tom Francen, based upon a determination that he had driven a motor vehicle with a legally excessive breath alcohol content. The district court reversed the revocation order because, it found, the initial stop of his vehicle by police was not supported by reasonable suspicion. We hold that the legality of the initial contact between a driver and police is not relevant in a civil revocation proceeding. Therefore, we reverse the district court's judgment, and remand the case to the district court for reinstatement of the revocation order.
*695 I. Background and Procedural History
¶ 2 At approximately 2:00 a.m. on January 3, 2010, a Littleton police officer pulled behind Mr. Francen's vehicle, which was stopped at a traffic light in a left turn lane. A passenger in the vehicle got out for a moment and appeared to be trying to contact the driver of another vehicle in the adjacent lane. The passenger then got back in to Mr. Francen's vehicle. When the light turned green, Mr. Francen turned left and the police officer pulled him over.
¶ 3 When the officer approached Mr. Francen, who was seated in the driver's seat of the vehicle, he observed that Mr. Francen had a strong odor of alcohol. Mr. Francen's eyes were bloodshot and his speech was slurred. He admitted to having consumed three or four alcoholic drinks. The officer told Mr. Francen to get out of the vehicle. When Mr. Francen did so, he was unsteady and had to hold onto the door to maintain his balance. After Mr. Francen failed to satisfactorily perform voluntary roadside maneuvers, the officer placed him under arrest and advised him of his options for taking a chemical test. Mr. Francen chose to take a breath test. The results of the test showed that he had a legally excessive breath alcohol content of .115 grams of alcohol per 210 liters of breath. Based on the breath test results, the officer issued Mr. Francen a notice of revocation of his driver's license.
¶ 4 Mr. Francen requested an administrative hearing to challenge the revocation. At the hearing, both the hearing officer and Mr. Francen's counsel questioned the police officer about why he had decided to stop Mr. Francen's vehicle. Based on the officer's testimony, Mr. Francen's counsel sought dismissal on the grounds that the officer had not had reasonable suspicion to justify the initial stop.
¶ 5 In a written decision, the hearing officer made findings concerning the reason the officer had stopped Mr. Francen's vehicle, but reached no specific conclusion about whether the stop was supported by reasonable suspicion. Instead, the hearing officer concluded that the exclusionary rule (the rule requiring exclusion of evidence when there has been a violation of constitutional protections against unreasonable searches and seizures) does not apply in civil license revocation proceedings and that "all evidence obtained by the officer may be considered." Based on that conclusion, the hearing officer sustained the revocation.
¶ 6 Mr. Francen then filed this case in the district court, seeking judicial review of the revocation order. He again argued that the Department should have dismissed the revocation proceeding based on the lack of reasonable suspicion to support the initial stop of his vehicle.
¶ 7 The district court agreed with Mr. Francen, finding that "the initial stop of [Mr. Francen's] vehicle was unlawful under the reasonable suspicion standard." The district court further concluded that the hearing officer had erred in considering evidence of the roadside sobriety and breath tests derived from the unlawful stop, and that without that evidence, the hearing officer's order was arbitrary and capricious because it was not supported by substantial evidence. Consequently, the court reversed the revocation order and remanded the matter to the Department for reinstatement of Mr. Francen's license.
¶ 8 The Department appeals.
II. Standard of Review
¶ 9 Judicial review of a driver's license revocation order is governed by subsection 42-2-126(9)(b), C.R.S. 2011. It provides that a reviewing court may reverse the Department's determination only if it (1) exceeded its constitutional or statutory authority; (2) erroneously interpreted the law; (3) acted in an arbitrary and capricious manner; or (4) made a determination that is unsupported by the evidence in the record. See Baldwin v. Huber, 223 P.3d 150, 152 (Colo.App.2009) ; Scherr v. Colo. Dep't of Revenue, 49 P.3d 1217, 1219 (Colo.App.2002).
¶ 10 The credibility of witnesses, the weight to be given to the evidence, and the resolution of conflicting evidence are factual matters solely within the province of the hearing officer as the trier of fact. See Baldwin, 223 P.3d at 152 ; see also Charnes v. Lobato, 743 P.2d 27, 32-33 (Colo.1987).
*696 However, we review de novo agency determinations regarding questions of law. See Meyer v. State, 143 P.3d 1181, 1187 (Colo.App.2006). We are in the same position as the district court in reviewing the Department's action in the revocation proceedings based on the administrative record. Baldwin, 223 P.3d at 152.
III. Analysis
¶ 11 Two statutes are relevant to the issues presented in this appeal, sections 42-2-126 and 42-4-1301.1, C.R.S.2011. Section 42-2-126 governs how a law enforcement officer must initiate the civil revocation process, and sets forth a procedure for revoking a license based on information provided by an officer, challenging any revocation in an administrative proceeding before a hearing officer, and appealing a hearing officer's decision to the district court. Section 42-4-1301.1, commonly referred to as the express consent statute, provides, as most relevant here, that every driver of a motor vehicle must cooperate in the taking and completing of a chemical test under certain circumstances. It also addresses situations that may arise when an officer has requested that a driver take a chemical test.
¶ 12 For many years, a previous version of section 42-2-126, codified at section 42-2-122.1, C.R.S. (1984 Repl. Vol. 17), provided that a law enforcement officer who had arrested a driver for committing the misdemeanor offense of driving with an excessive blood alcohol content, see § 42-4-1202(1.5), C.R.S. (1984 Repl. Vol. 17), would then submit a report to the Department for it to determine whether to revoke the driver's license. § 42-2-122.1(2)(a), (3)(a), C.R.S. (1984 Repl. Vol. 17). In 1988, the General Assembly amended subsection 42-2-122.1(2)(a) to require the reporting officer to include in his report "a statement of the officer's probable cause for belief that" the driver had committed the misdemeanor offense. See Ch. 293, sec. 1, § 42-2-122.1(2)(a), 1988 Colo. Sess. Laws 1360.[1]
¶ 13 The applicable language of the express consent statute required drivers to submit to testing "if arrested for any misdemeanor offense arising out of acts alleged to have been committed while" driving under the influence of alcohol, and provided that a test would be administered at the direction of the arresting officer having "reasonable grounds to believe" a person was driving under the influence. § 42-4-1202(3)(a)(II), (3)(b), C.R.S. (1984 Repl.Vol. 17).
¶ 14 Applying the relevant provisions of the express consent statute as they existed before 1989, a division of this court held that a driver could challenge the legality of the initial police contact or traffic stop in a revocation proceeding, noting expressly that an arrest was a prerequisite to a request that a driver submit to a blood test. Sanger v. Colo. Dep't of Revenue, 736 P.2d 431, 432 (Colo.App.1987) ; see also Nefzger v. Dep't of Revenue, 739 P.2d 224, 229 (Colo.1987) (addressing a driver's challenge to the legality of the initial stop); Wallace v. Dep't of Revenue, 787 P.2d 181, 182 (Colo.App.1989).
¶ 15 In 1989, the General Assembly repealed and re-enacted subsection 42-2-122.1(2), with substantial amendments, and substantially amended the express consent statute. As relevant here, the General Assembly amended subsection (2) of section 42-2-122.1 to delete any requirement that an arrest precede a report to the Department. Instead, the officer was to provide an affidavit to the Department when he had "probable cause to believe" a driver had committed the misdemeanor offense. Ch. 148, sec. 149, § 42-2-122.1(2)(a), 1989 Colo. Sess. Laws 859 (now codified at § 42-2-126(5)(a) ). That change was made effective July 1, 1989, to offenses committed on or after that date. Ch. 148, sec. 157, 1989 Colo. Sess. Laws 861.
¶ 16 The General Assembly also added a provision to the express consent statute stating that individuals who drive a motor vehicle in Colorado are
required to take and complete ... any test or tests of the person's breath or blood for the purpose of determining the alcoholic content ... when so requested and directed by a law enforcement officer having *697 probable cause to believe that the person was driving a motor vehicle in violation of the prohibitions against DUI, DUI per se, DWAI, habitual user, or UDD.
See Ch. 363, sec. 6, § 42-4-1202(3)(a)(II), 1989 Colo. Sess. Laws 1615 (now codified at § 42-4-1301.1(2)(a)(I), C.R.S.2011 ) (emphasis added). At the same time, the General Assembly did away with the requirement in the prior version of the express consent statute that an arrest precede an officer's request that a driver take a chemical test. Id. These changes also were made effective July 1, 1989, to offenses committed on or after that date. Ch. 363, sec. 13, 1989 Colo. Sess. Laws 1623.
¶ 17 Three years after the 1989 amendments to former section 42-2-122.1 and the express consent statute, in Peterson v. Tipton, 833 P.2d 830 (Colo.App.1992), a division of this court considered a driver's challenge to a revocation for a violation that had occurred on January 30, 1990. The division held that although the legality of the initial traffic stop and subsequent arrest are not necessary elements in revocation proceedings that the Department must prove, "a driver may properly raise such issues as a defense in such ... proceedings." Id. at 831. Apparently overlooking the 1989 amendments noted above, the division reasoned that, even under the version of the express consent statute in effect on January 30, 1990, "a police officer is not authorized to request and to direct an arrested driver to submit to alcohol testing absent 'probable cause' for the DUI arrest, and, by implication, absent reasonable suspicion for the initial stop." Id.[2]
¶ 18 Since Peterson was decided, at least one other division of this court has held (citing Peterson) that a driver may challenge the legality of the initial police contact in a revocation proceeding. See Baldwin, 223 P.3d at 152 (licensee may properly raise issues concerning legality of initial investigatory stop). Other divisions appear to have assumed this is so, without addressing the issue. See Shafron v. Cooke, 190 P.3d 812, 814 (Colo.App.2008) (driver committed traffic infraction that justified stop of his vehicle by police); Hampe v. Tipton, 899 P.2d 325, 329 (Colo.App.1995) (investigatory stop of driver was justified and reasonable in purpose, scope, and character); see also Meyer, 143 P.3d at 1186 (ruling regarding probable cause or reasonable suspicion to detain driver in criminal proceeding is not binding on the Department in revocation proceeding based on same incident); but see Baldwin, 223 P.3d at 154-56 (Furman, J., specially concurring) (concluding that a licensee may not challenge the legality of the initial stop). Most recently, a division of this court observed that "whether a licensee in a revocation hearing may properly argue that his stop and arrest were not supported by reasonable suspicion and probable cause and that evidence resulting from them should, therefore, be excluded" is an "open question." Fallon v. Colo. Dep't of Revenue, 250 P.3d 691, 695 (Colo.App.2010).
¶ 19 We conclude that the Peterson division's holding is not supported by the relevant statutory text. We further conclude that application of the exclusionary rule in the license revocation context is not justified. Thus, we decline to follow Peterson and Baldwin. See Valentine v. Mountain States Mut. Cas. Co., 252 P.3d 1182, 1195 (Colo.App.2011) (one division of the court of appeals is not bound by the decision of another division).
¶ 20 The question of statutory meaning, which we address first, is one that we review de novo. Spahmer v. Gullette, 113 P.3d 158, 161 (Colo.2005). "Our primary responsibility in any statutory analysis is to give effect to *698 the legislative intent motivating the enactment of the statute." Simpson v. Bijou Irrigation Co., 69 P.3d 50, 59 (Colo.2003) ; accord Carlson v. Ferris, 85 P.3d 504, 508 (Colo.2003) (we give effect "to the General Assembly's intent in enacting [the] particular statute"). To do this, we look first to the statute's language, giving the words and phrases used therein their plain and ordinary meanings. Crandall v. City & County of Denver, 238 P.3d 659, 662 (Colo.2010). We also consider the statute as a whole so as to give consistent, harmonious, and sensible effect to all its parts. Bd. of County Comm'rs v. Costilla County Conservancy Dist., 88 P.3d 1188, 1192 (Colo.2004). Likewise, where, as here, two statutes relate to the same subject, we consider them together; and where possible we construe them in a way that they harmonize with each other. See Simpson, 69 P.3d at 59 ; Huddleston v. Bd. of Equalization, 31 P.3d 155, 159 (Colo.2001).
¶ 21 If, after applying these principles, we determine that the statute is unambiguous, we apply it as written and do not resort to other interpretive rules of statutory construction. Crandall, 238 P.3d at 662 ; Spahmer, 113 P.3d at 162. But if we determine that the statute is ambiguous in some material way, we may look to extrinsic evidence of the General Assembly's intent in enacting it, including, for example, prior law, legislative history, the consequences of a particular construction, and the goal of the statutory scheme. Costilla County Conservancy Dist., 88 P.3d at 1193 ; see § 2-4-203, C.R.S.2011.
¶ 22 Subsection 42-2-126(5)(a) provides that "a law enforcement officer ha [ving] probable cause to believe that a person should be subject to license revocation for excess [blood alcohol content] or refusal" to take or complete a chemical test shall submit an affidavit to the Department "containing information relevant to the legal issues and facts that shall be considered by the department to determine whether the person's license should be revoked as provided in subsection (3) of this section." Subsection 42-2-126(6)(a) provides that the Department "shall determine whether the person's license should be revoked under subsection (3) of this section." Subsection 42-2-126(3), in turn, provides that the Department "shall" revoke a driver's license for excessive blood alcohol content or refusal to take or complete, or to cooperate in the taking or completing, of a chemical test as required by several statutes, including subsection 42-4-1301.1(2). A driver may request a hearing to review "the department's determination ...." § 42-2-126(7)(a).
¶ 23 Subsection 42-4-1301.1(2)(a)(I) provides that "a law enforcement officer having probable cause to believe that the person was driving a motor vehicle in violation of the prohibitions against DUI, DUI per se, DWAI, habitual user, or UDD" may request that the driver take and complete a chemical test. See also § 42-4-1301.1(2)(b)(I) (providing that such a request may be made to determine "the drug content within the person's system").
¶ 24 Neither section 42-2-126 nor section 42-4-1301.1 says anything about the initial contact between the officer and the driver, much less that the circumstances of the initial stop are relevant to the Department's determination of whether a driver's license should be revoked.[3] To the contrary, the statutes make clear that the Department's determination is to be based solely on whether the evidence supports revocation for one of the reasons set forth in subsection 42-2-126(3). Thus, we cannot conclude either that the Department must establish that the initial contact was lawful before revoking a license or in defending a revocation in subsequent proceedings, or that a driver may challenge the lawfulness of the initial contact in contesting revocation without effectively adding language to the revocation statutes. It is fundamental, however, that a court may not "create an addition to a statute that the plain language does not suggest or demand." Spahmer, 113 P.3d at 162 ; accord Carruthers *699 v. Carrier Access Corp., 251 P.3d 1199, 1204 (Colo.App.2010).
¶ 25 We see nothing in the plain language of sections 42-2-126 and 42-4-1301.1 that suggests or demands the conclusion that the lawfulness of the initial contact is a relevant circumstance in the revocation process. In this respect, we observe that the governing statutes differ significantly from those which governed license revocation before the 1989 amendments. As noted, the earlier version of the express consent statute provided that an arrest of the driver for a misdemeanor criminal offense must precede any request to submit to chemical testing. Divisions of this court applying that statute held, therefore, that a driver could challenge the lawfulness of the arrest, reasoning, it appears, that by implication the General Assembly must have authorized testing only when the arrest was lawful. See Wallace, 787 P.2d at 182 ; Sanger, 736 P.2d at 432 ; see also People v. Krueger, 208 Ill.App.3d 897, 153 Ill.Dec. 759, 567 N.E.2d 717, 721 (1991) ; Pooler v. Motor Vehicles Div., 306 Or. 47, 755 P.2d 701, 702-03 (1988) ; but see Lopez v. Director, New Hampshire Div. of Motor Vehicles, 145 N.H. 222, 761 A.2d 448, 449-50 (2000) (though an arrest is necessary to suspend a license, the lawfulness of such an arrest need not be established in an administrative revocation proceeding); Commonwealth v. Wysocki, 517 Pa. 175, 535 A.2d 77, 79 (1987) (requirement that arrest precede request for testing did not allow lawfulness of arrest to be challenged in revocation proceeding).[4]
¶ 26 Whatever the validity of the rationale employed by the divisions construing the pre-1989 version of the express consent statute, it does not apply to the current version of that statute or section 42-2-126. The express consent statute no longer provides that an arrest is a prerequisite to a request for chemical testing. Indeed, arrest of the driver is not mentioned in either the express consent statute or section 42-2-126. Further, in 2002, the General Assembly moved the portions of the express consent statute dealing with testing to a new section separate from that addressing criminal processes and sanctions. Ch. 342, sec. 3, § 42-4-1301.1, 2002 Colo. Sess. Laws 1907. Unlike the dissent, we do not view this separation as "nonsubstantive." Rather, we believe it demonstrates an intent by the General Assembly to further distinguish between criminal processes and sanctions and civil revocation. This was further borne out in 2005, when the General Assembly amended subsection 42-2-126(5)(a) to replace the language that an officer have probable cause to believe that the driver had committed a misdemeanor offense with language that the officer have probable cause to believe that the driver's license should be revoked. Ch. 185, sec. 16, 2005 Colo. Sess. Laws 647. This change effectively completed the separation of the revocation process from the statutes imposing criminal sanctions for driving with excessive drug or alcohol content. See also § 42-2-126(6)(a) ("The determination of [whether a license should be revoked for reasons set forth in subsection (3) ] is independent of the determination of a court of the same or similar facts in the adjudication of any criminal charges arising out of the same occurrence. The disposition of the criminal charges shall not affect any revocation under this section."). Considered together, these changes indicate that the General Assembly has sought to dispense with any notion that the circumstances of the initial contact are relevant in a revocation proceeding, except insofar as those circumstances show evidence of intoxication. See Charnes, 743 P.2d at 30 ("when a statute is amended, it is presumed that the legislature intended to change the law"; applying principle where amendment omitted a "reasonable grounds" requirement in a previous version of current section 42-2-126 ); see also Chase v. Neth, 269 Neb. 882, 697 N.W.2d 675, 680-81 (2005) (legislature's amendment of revocation statute to no longer require arrest before requesting a chemical test meant state *700 was no longer required to establish the validity of the arrest to revoke a driver's license).
¶ 27 And this leads us to the "probable cause" language of the express consent statute on which the Peterson division purported to rely. It is clear that "probable cause" as used in both sections 42-2-126 and 42-4-1301.1 describes only the quantum and quality of evidence known to the officer about whether the driver either had driven in violation of drinking and driving laws or had refused to submit to testing. Neither question necessarily implicates the lawfulness of the initial contact.[5]
¶ 28 We therefore hold that the plain language of the relevant statutes does not require, or even allow, a hearing officer (or a district or appellate court) to determine the lawfulness of the initial contact in a revocation proceeding under section 42-2-126.[6]
¶ 29 We are not persuaded to the contrary by Mr. Francen's contention that the General Assembly has not amended the relevant statutes in response to the holding in Peterson. As noted above, the General Assembly amended the express consent statute in 2002 to place the provisions addressing testing and those criminal processes and sanctions in separate statutes. And the court amended section 42-2-126 in 2005 to remove any reference to commission of a criminal offense, and in so doing to change the fact as to which probable cause must exist from commission of a misdemeanor offense to grounds for revocation under subsection 42-2-126(3).
¶ 30 In any event, we are not persuaded that the General Assembly's failure to change the statutes in some other way has any significance here. We acknowledge that from time to time the Colorado Supreme Court and divisions of this court have observed that when the General Assembly changes some portion of a statute, but fails to change a portion of a statute that has been judicially construed, it is presumed that the General Assembly agrees with the prior judicial construction. See, e.g., Bd. of County Comm'rs v. Colo. Pub. Utils. Comm'n, 157 P.3d 1083, 1089 (Colo.2007) ; City of Colorado Springs v. Powell, 156 P.3d 461, 467 (Colo.2007) ; Renaissance Salon v. Indus. Claim Appeals Office, 994 P.2d 447, 450 (Colo.App.1999). But because we base our conclusion here on the plain meaning of the relevant statutory text, a substantial portion of which the Peterson division overlooked, we do not resort to other rules of statutory interpretation, such as this one. See Spahmer, 113 P.3d at 162.
¶ 31 Further, this particular rule of construction is one of very limited value. This is so for several reasons.
¶ 32 First, as noted, our task in interpreting the meaning of a statute is to determine and give effect to the intent of the General Assembly that enacted it. See Simpson, 69 P.3d at 59. Each General Assembly is a distinct entity, see § 2-4-215(1), C.R.S.2011, and therefore what a later General Assembly thinks a statute does or should mean says little, if anything, about what the General Assembly that enacted it intended it to mean. See Union Pacific R.R. Co. v. Martin, 209 P.3d 185, 189 (Colo.2009) ("Amendatory legislation, in the absence of an adequate indication of intent to clarify, may therefore, in and of itself, contribute precious little to the judicial construction of *701 the original, un-amended statutory language."). Even a later General Assembly's explicit expression of what a previously enacted statute was intended to mean does not control the interpretation of the statute. See, e.g., People v. Vigil, 251 P.3d 442, 449 (Colo.App.2010) ; see also O'Gilvie v. United States, 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996) ("[T]he view of a later Congress cannot control the interpretation of an earlier enacted statute."); Minto v. Sprague, 124 P.3d 881, 885 (Colo.App.2005) (evidence of current political climate, interpretation placed on statute by a subsequent group of legislators, and debates over bills proposed after enactment of the subject statute are of no probative value in determining the General Assembly's intent when the statute was enacted). It would be anomalous to place more weight on later General Assemblies' silence than we would place on actual statements by and actions of later General Assemblies.
¶ 33 Second, this rule of statutory interpretation assumes a great deal. It assumes that legislators know about a court's interpretation of the statute. It also assumes that if there are legislators who do not agree with the court's interpretation, they would necessarily seek to change the statute in response to the court's interpretation, notwithstanding that the General Assembly's time and resources are limited.[7] Whether these assumptions are justified by actual facts in a particular case will often be unknowable. In light of this inherent uncertainty, kneejerk application of this rule would frequently prove too much.
¶ 34 Third, assuming that the General Assembly's silence is evidence of ratification of a prior judicial construction, it remains the rule that "the legislature's construction of a statutory ... provision is advisory, not binding." Bd. of County Comm'rs v. Vail Associates, Inc., 19 P.3d 1263, 1273 (Colo.2001) ; see also U.S. Fax Law Center, Inc. v. Henry Schein, Inc., 205 P.3d 512, 516-17 (Colo.App.2009) ; see generally 2B Norman J. Singer & J.D. Sambie Singer, Statutes and Statutory Construction § 49.11 (7th ed. 2007). Textual and contextual evidence of legislative intent controls over any contrary inference drawn from legislative silence. Burns v. United States, 501 U.S. 129, 136, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) ; US Fax Law Center, 205 P.3d at 516-17. Here, that textual and contextual evidence is clear.
¶ 35 Perhaps for some of these reasons, courts have recognized that "[l]egislative silence is a poor beacon to follow in discerning the proper statutory route." Zuber v. Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) ; accord U.S. Fax Law Center, 205 P.3d at 516 ; see also United States v. Price, 361 U.S. 304, 306-11, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) (rejecting the taxpayer's argument that because Congress had not changed the relevant statute in response to a federal court of appeals' decision, the Court should adopt the prior construction) ("Such non-action by Congress affords the most dubious foundation for drawing positive inferences."); see generally 2B Statutes and Statutory Construction § 49.10. In this particular case, given the clarity of the statutory language, the fact the Peterson division's premise as to the actual statutory language was incorrect, the absence of any indication that the Peterson division's interpretation of the express consent statute has been brought to the General Assembly's attention, and the paucity of analysis in Peterson, we see no reason to give significant weight to the General Assembly's silence.
¶ 36 The next question is whether allowing (or requiring) an inquiry as to the lawfulness of the initial contact for the purpose of determining whether evidence obtained following the initial contact should be suppressed is mandated by constitutional provisions governing searches and seizures. See U.S. Const. amend. IV ; Colo. Const. art. II, § 7. Posed differently, the question is, even if the language of the relevant statutes does not allow a driver to challenge the legality of the initial contact, does the exclusionary *702 rule apply to driver's license revocation proceedings? It does not.
¶ 37 The exclusionary rule is a judicially created remedy intended to protect the constitutional right to privacy, as expressed through the Fourth Amendment to the United States Constitution, by deterring illegal police conduct. United States v. Calandra, 414 U.S. 338, 347, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ; Ahart v. Colo. Dep't of Corr., 964 P.2d 517, 520 (Colo.1998). It applies routinely in criminal cases, but not so in civil cases. See United States v. Janis, 428 U.S. 433, 446-47, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) ; Ahart, 964 P.2d at 520. Because application of the exclusionary rule typically imposes a substantial cost on the societal interest in law enforcement, it should be applied only where its deterrent purpose would be most effectively served. See Pennsylvania Bd. of Probation & Parole v. Scott, 524 U.S. 357, 362-63, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (exclusionary rule does not apply in parole revocation proceeding); Janis, 428 U.S. at 447, 448-49, 96 S.Ct. 3021 ; Calandra, 414 U.S. at 348, 94 S.Ct. 613.
¶ 38 In determining whether the exclusionary rule should apply in a civil case, a court must balance the likely deterrent effect against the societal cost of excluding relevant evidence: only when the former outweighs the latter should the rule apply. Scott, 524 U.S. at 363, 118 S.Ct. 2014 ; Janis, 428 U.S. at 453-54, 96 S.Ct. 3021 ; Ahart, 964 P.2d at 520.[8]
¶ 39 To assess the likely deterrent effect of applying the rule in a particular case, the court must consider "(1) whether the illegal agency conduct is 'inter-sovereign' or 'intra-sovereign'; and (2) whether the proceedings may be characterized as 'quasi-criminal.' " Ahart, 964 P.2d at 520. Neither consideration is dispositive. Id. at 521 ; see I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1042-45, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (exclusionary rule did not apply in deportation proceeding even though agency conduct was intra-sovereign).
¶ 40 The conduct at issue here is inter-sovereign-that is, the entity that allegedly committed the violation (the Littleton Police Department, a municipal entity) is not the same entity which sought to introduce the evidence (the Colorado Department of Revenue, a state entity). See Ahart, 964 P.2d at 520. Thus, applying the rule would result in only marginal deterrence because any punishment imposed on the Littleton police officer would be indirect. Id.; see Janis, 428 U.S. at 457-58, 96 S.Ct. 3021 ("[C]ommon sense dictates that the deterrent effect of the exclusion of relevant evidence is highly attenuated when the 'punishment' imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a different sovereign.").
¶ 41 Further, the proceeding here is not quasi-criminal. "A proceeding is quasi-criminal if it provides for punishment but is civil in form.... The more similar the objective of a civil proceeding to the purpose of criminal proceedings-punishment for violations of the law-the more likely exclusion of the evidence will foster deterrence." Ahart, 964 P.2d at 520 (citation omitted). To be sure, revocation of a license to drive has some punitive effect. But the primary objective of the revocation statute is to protect public safety. See § 42-2-126(1)(a), (c) (one purpose of revocation is to "provide safety for all persons using the highways of this state by quickly revoking the driver's license of any person who has shown himself or herself to be a safety hazard" and another is to prevent relicensing of a driver until the Department is satisfied that the driver no longer constitutes a safety hazard); see also Nefzger, 739 P.2d at 228 (revocation statute "is a remedial statute calculated to ensure public safety on the highways"). Punishment of the driver is merely incidental to this purpose.
¶ 42 The likely deterrent effect is rendered even less significant by the fact that any *703 evidence unlawfully obtained would be excluded in any criminal case brought as a result of the driver's conduct. E.g., § 42-4-1301(1)(a), (b), (2)(a), C.R.S.2011 (providing that driving while under the influence of alcohol, driving while impaired by alcohol, and driving with a blood alcohol content of 0.08 or more are misdemeanor criminal offenses); see Janis, 428 U.S. at 448, 458, 96 S.Ct. 3021 (where evidence is likely to be excluded in a criminal proceeding, excluding the evidence in a civil proceeding "is unlikely to provide significant, much less substantial, additional deterrence"); see also Scott, 524 U.S. at 367, 118 S.Ct. 2014 (exclusion of evidence from a criminal case will have more deterrent effect than exclusion from a parole revocation proceeding).
¶ 43 Looking at the other side of the scale, we conclude that the societal cost of applying the exclusionary rule in civil revocation proceedings would be substantial. In many (perhaps most) cases, exclusion would effectively doom any effort to revoke a person's license, thereby thwarting the public safety objective of the revocation laws. And applying the rule would further burden the administrative hearing process by requiring suppression hearings and determinations whenever drivers desire to challenge the legality of their initial contacts with police. The revocation statutes, however, plainly envision a quick determination based on the single issue of whether a driver operated a motor vehicle or vehicle with excessive blood alcohol content or refused a request for chemical testing.
¶ 44 We therefore hold that the exclusionary rule does not apply in civil revocation proceedings under section 42-2-126. In so holding, we align ourselves with the decisions by the vast majority of other courts that have applied the Janis balancing test to civil revocation proceedings. See Nevers v. State, 123 P.3d 958, 961-66 (Alaska 2005) ; Tornabene, 54 P.3d at 363-65 ; Fishbein, 743 A.2d at 1118-19 ; Martin, 176 P.3d at 949-53 ; Powell, 614 A.2d at 1306-07 ; Riche v. Dir. of Revenue, 987 S.W.2d 331, 333-36 (1999) ; Chase, 697 N.W.2d at 682-85 ; Lopez, 761 A.2d at 450-51 ; Holte v. State Hwy. Comm'r, 436 N.W.2d 250, 252 (N.D.1989) ; State v. Brabson, 976 S.W.2d 182, 184-86 (Tex.Crim.App.1998) ; Beller v. Rolfe, 194 P.3d 949, 951-55 (Utah 2008) ; but see Lussier, 757 A.2d at 1025-27 (3-2 decision based on the Vermont Constitution).
¶ 45 We do not lightly take issue with decisions rendered by other divisions of this court. But in our judgment the decision in Peterson is untenable as a matter of statutory construction and inconsistent with exclusionary rule jurisprudence, and therefore, unlike the majority in Baldwin, we conclude that it should not be followed.
¶ 46 The judgment is reversed and the case is remanded to the district court for reinstatement of the Department's order revoking Mr. Francen's driver's license.
Judge RUSSEL concurs.
Judge TAUBMAN dissents.

Before the 1988 amendment, the statute had required the reporting officer to include a statement of his "grounds" for believing that the driver had committed the misdemeanor offense.

The dissent believes that the Peterson division did not mischaracterize the express consent statute, positing that the division used the term "the arrested driver" because the driver in that case had been arrested, and that the reference to "the DUI arrest" was merely a "shorthand way of referring to" the prerequisite for requesting that a driver submit to a chemical test, i.e., probable cause to believe the driver has committed a drinking and driving offense. We cannot agree. Linguistically speaking, the Peterson division was referring to drivers generally ("an arrested driver") and to the requirements of the express consent statute generally ("Even under the provisions of the express consent statute currently in effect, a police officer"), not to the specific facts of the case before it in addressing the Department's argument concerning the language of the statute.

The dissent makes much of the fact that a portion of the express consent statute not relevant in this case mentioned "lawful contact" following amendments in 1989. The fact is, however, that because of later amendments, no portion of the express consent statute now mentions "lawful contact."

The dissent relies on Krueger and Pooler. But the statutes at issue in those cases expressly required that the officer arrest the driver before requesting a chemical test, and this statutory language was the basis for the courts' decisions in those cases. Krueger, 153 Ill.Dec. 759, 567 N.E.2d at 721 ; Pooler, 755 P.2d at 702-03. The relevant statutes here contain no such requirement.

The General Assembly frequently uses the term "probable cause" to refer only to the quantum and quality of evidence considered by a decision-maker. E.g., §§ 10-4-418(1), 10-16-216.5(1), 12-6-104(2)(f)(II), 12-22-110(4)(a), 12-36.5-106(9)(e), (f), 12-38-118(1)(a), 12-38-118.5(3), 12-42-114(1), 12-47-303(6), 13-25-126.5(5)(a), 15-11-517, 15-12-905, 22-33-104.5(3)(g), 24-50-125.3, 24-109-105(1)(b), 25-4-506(3), 42-20-108(5), C.R.S.2011.

This conclusion is in accord with those of the clear majority of courts in other jurisdictions that have construed similar statutes. See, e.g., Tornabene v. Bonine ex rel. Arizona Highway Dep't, 203 Ariz. 326, 54 P.3d 355, 360-62 (App.2002) ; Fishbein v. Kozlowski, 252 Conn. 38, 743 A.2d 1110, 1114-17 (1999) ; Martin v. Kansas Dep't of Revenue, 285 Kan. 625, 176 P.3d 938, 942-44 (2008) ; Powell v. Secretary of State, 614 A.2d 1303, 1305-06 (Me.1992) ; Chase, 697 N.W.2d at 680-81 ; Lopez, 761 A.2d at 449-50 ; Beavers v. State, 109 Nev. 435, 438-39, 851 P.2d 432 (1993) ; Wysocki, 535 A.2d at 79 ; but see Watford v. Ohio Bureau of Motor Vehicles, 110 Ohio App.3d 499, 674 N.E.2d 776, 778 (Ohio Ct.App.1996) (construing a statute that required probable cause to arrest before testing could be requested); State v. Lussier, 171 Vt. 19, 757 A.2d 1017, 1019-20 (2000).

There is no indication that the Peterson division's decision has ever been brought to the General Assembly's attention.

We note that Ahart was decided several years after Peterson. And no division of this court has yet applied the Ahart balancing test to license revocation proceedings. But see Baldwin, 223 P.3d at 154-55 (Furman, J., specially concurring) (concluding that the exclusionary rule does not apply in this context).