**Charles E. AHART; Gavin McWhirter; and State Personnel Board, State of Colorado, Petitioners,**

**v.**

**COLORADO DEPARTMENT OF CORRECTIONS, DIVISION OF ADULT SERVICES, BUENA VISTA CORRECTIONAL FACILITY, Respondent.**

No. 96SC751.

Supreme Court of Colorado, En Banc.

Sept. 14, 1998.

---

518

Carol M. Iten, Denver, for Charles Ahart and Gavin McWhirter.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Linda L. Siderius, Deputy Attorney General, Richard Djokic, First Assistant Attorney General, Mary S. McClatchey, Assistant Attorney General, Regulatory Law Section, Denver, for State Personnel Board.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, John August Lizza, First Assistant Attorney General, David A. Beckett, Assistant Attor-

ney General, State Services Section, Denver, for Respondent.

Justice BENDER delivered the Opinion of the Court.

The issue before us is whether to extend the exclusionary rule enunciated in *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914) to civil hearings to terminate a correctional officer for admitted drug use. We decline to apply the rule to this case.

The exclusionary rule is a judicially created remedy intended to protect the constitutional right of privacy by deterring illegal police conduct. The exclusionary rule bars evidence from trial that police obtain by violating an accused's constitutional right to privacy. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the United States Supreme Court articulated the framework for identifying the civil cases in which it is appropriate to apply the rule. The *Janis* Court required weighing the deterrent benefits of excluding illegally seized evidence against the cost of losing relevant evidence. *See id.* at 453–54, 96 S.Ct. 3021. Applying the rule in this case might serve the purpose of deterrence since the same governmental agency that engaged in the unconstitutional search and seizure seeks to use the unlawfully seized evidence in a civil proceeding. On the other hand, deterrence is unlikely since the agency engaged in the unlawful conduct and initiated the discharge proceedings to evaluate the future job performance of two of its employees, not to punish its employees. Considering the security and safety for which correctional officers are responsible, we conclude that the societal costs of applying the rule to exclude evidence of admitted drug use outweigh its deterrent benefits. Hence, we decline to apply the exclusionary rule to these government termination proceedings.

We affirm the decision of the court of appeals in *Ahart v. Department of Corrections*, 943 P.2d 7 (Colo.App.1996), which held that evidence of marijuana use obtained in violation of the Fourth Amendment rights of Ahart and McWhirter should not have been suppressed. In so holding, the court reversed an order of the State Personnel Board, which applied the exclusionary rule. *See id.* at 10. We return this case to the court of appeals for further proceedings consistent with this opinion.

## I.   FACTS

Charles E. Ahart and Gavin McWhirter were employees of the Department of Corrections (DOC), at the Buena Vista Correctional Facility (BVCF). BVCF is a medium security correctional facility, housing approximately 1200 inmates. Ahart was the BVCF housing manager, a position that involved supervising 100 BVCF staff members and overall responsibility for the five units of housing at BVCF. Ahart also acted for the warden in his absence and had daily contact with inmates. McWhirter held the rank of sergeant at BVCF and was the lead worker on an assigned shift. He had daily contact with inmates and was a member of the Special Operations Response Team (SORT). SORT members are correctional officers who remain on call at all times to respond to dangerous and difficult situations at BVCF.

The warden at BVCF received information that two BVCF employees, Ahart and McWhirter, used drugs. Based upon this information, the warden ordered McWhirter and Ahart to take drug tests. Both tested positive for marijuana and subsequently admitted its use. As a result, DOC terminated them.

At a review hearing, an Administrative Law Judge (ALJ) found that DOC lacked reasonable suspicion to order Ahart and McWhirter to submit to drug tests. However, applying the balancing test set forth in *Janis*, the ALJ ruled that there was no basis for applying the exclusionary rule to exclude the results of the drug tests because the benefits of applying the rule did not outweigh the costs. On appeal to the State Personnel Board, the Board reversed the ALJ, holding that the exclusionary rule applies to the employment termination proceeding. In reaching its decision, the Board reasoned that

excluding the illegally seized evidence furthered the deterrent purpose of the rule.

The court of appeals reversed, reasoning that the Board "erred by focusing exclusively on the intrasovereign nature of this action and by failing to consider the societal benefits of removing complainants from contact with other inmates." *Ahart*, 943 P.2d at 10. The court vacated the Board's order for reinstatement and back pay and remanded the case to the Board for reconsideration of the ALJ's order.[1]

## II. APPLICABLE LAW

■ The exclusionary rule is a judicially created remedy designed to safeguard the Fourth Amendment's right of privacy through its deterrent effect. *See Weeks*, 232 U.S. at 393–94, 34 S.Ct. 341. The primary purpose of the rule is to deter unlawful conduct. *See Janis*, 428 U.S. at 454 n. 29, 96 S.Ct. 3021. A secondary purpose is to "prevent the court from placing its imprimatur upon overzealous police action." *People v. Harfmann*, 638 P.2d 745, 747 (Colo.1981).[2] The rule applies in all state criminal proceedings. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ By contrast, the exclusionary rule does not apply in all civil cases. *See Janis*, 428 U.S. at 447, 96 S.Ct. 3021. The question of whether the exclusionary rule applies in a particular civil case requires weighing the deterrent benefits of applying the rule against the societal cost of excluding relevant evidence. *See id.* at 453–54, 96 S.Ct. 3021. There is no "bright line" to determine when the rule should apply, and courts must apply the *Janis* analytic framework on a case by case basis. *See Harfmann*, 638 P.2d at 747.

■ The benefits of the rule are greatest when its application is likely to further the rule's deterrent purpose. *See, e.g., Wolf v. Commissioner*, 13 F.3d 189, 193 (6th Cir.

1993) (holding that the decision to apply the exclusionary rule depends on whether application of the rule is substantially likely to deter future violations of the Fourth Amendment). The assessment of the deterrent benefits requires a fact-specific analysis that usually involves two considerations: (1) whether the illegal agency conduct is "inter-sovereign" or "intra-sovereign"; and (2) whether the proceedings may be characterized as "quasi-criminal."

An intra-sovereign action occurs when the same governmental agency that committed the constitutional violation seeks to use the illegally obtained evidence. An intra-sovereign action supports the application of the exclusionary rule because the exclusion of the evidence "punishes" the agency for its unlawful actions. On the other hand, when a violation is inter-sovereign, that is, when the agency that committed the violation is not the same entity seeking to introduce the evidence, applying the rule results in only marginal deterrence because the punishment imposed upon a different agency is indirect. *See Janis*, 428 U.S. at 457–58, 96 S.Ct. 3021.

■ Just as the intra-sovereign nature of a violation supports the application of the exclusionary rule by increasing the likelihood that the rule will result in deterrence, so does classifying the civil proceeding as quasi-criminal or punitive in nature. A proceeding is quasi-criminal if it provides for punishment but is civil in form. *See Pike v. Gallagher*, 829 F.Supp. 1254, 1265 (D.N.M.1993). The more similar the objective of a civil proceeding to the purpose of criminal proceedings—punishment for violations of the law—the more likely exclusion of the evidence will foster deterrence. Perhaps the clearest example of civil proceedings that are quasi-criminal are government suits seeking forfeiture of non-contraband property based on the theory that the owner used the property in the commission of a criminal offense.[3]

---

1. The issue as framed on certiorari is:

    Does the exclusionary rule allow the suppression of evidence, and fruits of that evidence, obtained by means in violation of the Fourth Amendment of the United States Constitution, in employment termination proceedings?

2. This purpose has been termed the "normative function of the rule" by Justice Erickson in *Harfmann*, 638 P.2d at 747, and "judicial integrity" by Justice Blackmun in *Janis*, 428 U.S. at 458 n. 35, 96 S.Ct. 3021.

3. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170

Neither the intra-sovereign nature of the unconstitutional conduct nor the characterization of the civil case as quasi-criminal is dispositive of whether the exclusionary rule should apply to a particular civil proceeding. *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1043, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) illustrates this principle. In *Lopez–Mendoza,* I.N.S. officials illegally arrested an alien who subsequently admitted that he had entered the United States unlawfully. The I.N.S. officials later brought a deportation action against the alien on the basis of this admission.

The United States Supreme Court refused to apply the exclusionary rule to suppress the alien's admission of his unlawful entry into the United States. The Court first determined that the deterrent effect of applying the rule in deportation proceedings was minimal, notwithstanding the intra-sovereign nature of the unconstitutional acts.[4] The Court then found that the proceedings were not quasi-criminal. *See id.* at 1042, 104 S.Ct. 3479.[5]

Similarly, in *People v. Harfmann,* 638 P.2d 745 (Colo.1981), we held that characterization of a civil proceeding as punitive in nature is not dispositive of whether to extend the exclusionary rule to attorney discipline proceedings. *Harfmann* involved a disciplinary action against an attorney whose felony convictions for distribution of controlled substances were overturned on appeal because of the unconstitutional conduct by police in seizing the narcotics. Attorney disciplinary proceedings are brought by the Office of Disciplinary Counsel, which is independent from the law enforcement agency that conducted the illegal search in *Harfmann.* Thus, the violations were of an inter-sovereign nature. After analyzing the possible deterrent effects of applying the rule, we weighed the deterrent benefits against the societal costs of excluding evidence. *See id.* at 747. The societal cost of depriving the disciplinary tribunal of relevant evidence of an attorney's criminal conduct was extremely high in light of the need to protect the public from unscrupulous attorneys. *See id.* at 747. Thus, applying the *Janis* test, we held the exclusionary rule did not apply to attorney disciplinary proceedings absent facts involving official misconduct that shocks the conscience of the court or is in bad faith. *See id.* at 748.

*Lopez–Mendoza* and *Harfmann* demonstrate how courts should apply the *Janis* test, and they emphasize that no single ele-

---

(1965) (holding that a forfeiture proceeding was quasi-criminal rather than civil in nature since its object was "to penalize for the commission of an offense against the law"); *see also United States v. Modes, Inc.,* 787 F.Supp. 1466, 1471 (Ct. Int'l Trade 1992) (applying the exclusionary rule and holding that an action to impose duties against jewelry importers involved in a double invoicing scheme was quasi-criminal rather than civil in nature since its objective was to impose a penalty). *But see Garrett v. Lehman,* 751 F.2d 997, 1003 (9th Cir.1985) (rejecting the argument that military administrative discharge proceedings initiated against a marine corporal were criminal or quasi-criminal, reasoning that the function of the proceedings was to determine eligibility for further military service, not to punish for past wrongs).

4. The Court cited the following factors as minimizing the deterrent benefits of the exclusionary rule in the context of deportation proceedings: (1) in many instances the I.N.S. could secure deportations without the illegally obtained evidence because the sole evidence required to make a determination is the respondent's identity and alienage; (2) the issue of exclusion of evidence would arise in only a small number of cases because 97.5% of illegal aliens arrested by the I.N.S. agree to voluntary deportation; (3) other remedies, such as declaratory relief, were available to shape the institutional practices of the I.N.S.; and (4) most important, the I.N.S. had its own comprehensive scheme for deterring Fourth Amendment violations by its officers.

5. Although the deportation proceedings were a complement to possible criminal prosecution, the Court determined that the primary purpose of the arresting officer, who acted unconstitutionally, "[was] to use the evidence in the civil deportation proceeding." *Lopez–Mendoza,* 468 U.S. at 1042, 104 S.Ct. 3479. Lastly, the Court reasoned that the societal costs of excluding evidence would be particularly high in deportation proceedings because exclusion would require courts to close their eyes to criminal offenses since an alien's unregistered presence constitutes a crime. *See id.* at 1047, 104 S.Ct. 3479. Weighing the benefits of applying the rule against the societal costs, the Court declined to extend the exclusionary rule to deportation proceedings despite the intra-sovereign nature of the constitutional violation. *See id.* at 1050, 104 S.Ct. 3479.

ment of the test is determinative. Having reviewed the law governing this case, we now apply the law to the facts before us.

## III. ANALYSIS

■ Ahart and McWhirter advance three arguments in support of applying the rule to this case: (1) the unconstitutional conduct was intra-sovereign; (2) the government discharge proceedings were quasi-criminal; and (3) the benefits outweigh the costs of applying the rule. We agree that the illegal conduct in this case is intra-sovereign. While conceding that the proceedings in this case are difficult to characterize, we conclude that the proceedings in this case are not quasi-criminal. Lastly, we hold that the societal costs of applying the rule exceed the deterrent benefits of the rule and conclude the rule should not apply to these proceedings.[6]

Turning to Ahart and McWhirter's first argument, we agree that the unconstitutional conduct in this case was intra-sovereign. The same DOC officials who violated Ahart and McWhirter's Fourth Amendment rights later sought to use the illegally seized evidence in their discharge proceedings. Thus, applying the rule would increase the likelihood of deterring unlawful behavior. We point out that here, as in *Harfmann*, the facts do not suggest that the unlawful actions of the DOC officials were taken in bad faith, or were of such a flagrant nature as to shock the conscience of the court. *See Harfmann*, 638 P.2d at 748; *Lopez–Mendoza*, 468 U.S. 1032, 1050–51, 104 S.Ct. 3479, 82 L.Ed.2d 778; *cf. Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

We next consider Ahart and McWhirter's second argument that the administrative discharge proceedings are quasi-criminal, and we conclude that they are not. Ahart and McWhirter urge us to follow *Pike v. Gallagher*, 829 F.Supp. 1254 (D.N.M.1993) and hold that employment termination proceedings are quasi-criminal. In *Pike*, a deputy sheriff sued officials of a county sheriff's department for terminating her after requiring her to take a drug test. Based on its determination that Pike was the subject of an unconstitutional random drug analysis and that Pike was terminated to penalize her for breaking the law rather than because the defendants were concerned about her job performance, the district court concluded Pike's termination proceeding was quasi-criminal and that the *Janis* balancing test tipped in favor of applying the exclusionary rule. *See id.* at 1266.

We are unpersuaded by *Pike*. To the extent that *Pike* stands for the proposition that government discharge proceedings of a law enforcement officer are quasi-criminal in nature, we conclude that it overlooks the safety and security-sensitive requirements of this position. Persons entrusted with public law enforcement duties, such as sheriffs in *Pike* or correctional officers in this case, who engage in drug use lose their ability to perform their jobs effectively. Consequently, discharge proceedings based on drug use may be initiated to evaluate that employee's future job performance.[7] Furthermore, as a federal district court opinion, Pike does not represent controlling precedent that we must follow. *See People v. Barber*, 799 P.2d 936, 940 (Colo.1990).

---

6. We note that the Board, the ALJ, and the court of appeals held that the DOC violated the Fourth Amendment rights of Ahart and McWhirter when the BVCF warden ordered them to submit to urinalysis drug tests. The question that we agreed to review on appeal in this case does not include this issue. Thus, our opinion assumes, without deciding, that Ahart and McWhirter were subjected to an unconstitutional search. *See Trevino v. HHL Fin. Servs., Inc.*, 945 P.2d 1345, 1346 n. 1 (Colo.1997) (declining to address an issue not raised on appeal).

7. *Pike* is also partly distinguishable from this case because in applying the *Janis* test the dis-

trict court relied upon the random nature in which the drug tests were administered to Pike. That court concluded that random drug testing would subject innocent employees to a highly intrusive search unrestrained by subjective factors that the government official must take into account before requiring employees to submit. *See Pike*, 829 F.Supp. at 1265. This case does not involve a broad government rule requiring random urinalyses of employees. Rather, it involves a single decision to drug test employees based on facts that, we assume, do not rise to reasonable suspicion.

We concede that the assessment as to whether this proceeding is quasi-criminal is a difficult one to make. Government discharge proceedings do exact a penalty from the employee involved—the loss of employment. Nonetheless, we are persuaded that the unlawful DOC actions, as well as the initiation of discharge proceedings, had as their primary purpose the evaluation of Ahart and McWhirter's qualifications to be correctional officers and were not intended to punish them for violations of the law.

Applying the *Janis* test, we conclude that although application of the rule is likely to further the rule's objective of deterrence due to the intra-sovereign nature of the Fourth Amendment violation, this benefit is somewhat diminished because the proceedings here are not quasi-criminal in nature.

Having considered the benefits of applying the rule, we turn to assessing the costs of excluding evidence of drug use by correctional officers in discharge proceedings. The societal costs of applying the exclusionary rule are substantial in this case due to the security and safety-sensitive nature of Ahart and McWhirter's jobs. We agree with the ALJ's determination that the state possesses a strong interest in maintaining an efficient and effective corrections system. The qualities essential for successful job performance as a correctional officer are incompatible with the effects of illegal drug use. A prison is a confined and densely populated setting which, as the ALJ noted, mandates that DOC employees be mentally alert and ready to handle emergencies. Correctional officers must be able to think and act quickly in order to prevent inmate violence and to respond to situations in which inmates require immediate medical attention. "Drug use impairs care and alertness", *Dimeo v. Griffin*, 943 F.2d 679, 683 (7th Cir.1991), and thus reduces the capability of correctional officers to successfully perform their jobs. In addition, correctional officers must possess a high level of credibility. They are often required to serve as witnesses against inmates in proceedings that could lengthen the time served by a prisoner. A correctional officer who uses illegal drugs compromises his or her credibility. Applying the exclusionary rule

here would ensure the continued employment of individuals whose drug use would negatively affect their ability to perform as corrections officers. Employing ineffective correctional officers threatens the integrity of the state corrections system. Evidence exclusion represents a substantial societal cost that counters any deterrent effect created by application of the rule. Hence, we hold that the *Janis* balancing test tips against applying the exclusionary rule in this case.

## IV. CONCLUSION

In civil proceedings, courts must decide whether the exclusionary rule applies on a case by case basis. The existence of certain factors does not automatically trigger application of the rule. In circumstances where some factors strongly support the rule's application—e.g., the Fourth Amendment violation is intra-sovereign; the proceeding at issue is quasi-criminal—a court's determination as to the applicability of the exclusionary rule cannot be legally sufficient unless the court weighs the benefits against the costs of applying the rule. Due to the nature of the employment involved here, the costs of excluding evidence that Ahart and McWhirter used drugs outweigh the benefits of applying the exclusionary rule, notwithstanding the intra-sovereign nature of the violation in this case. We agree with the court of appeals that the Board erred by holding that the exclusionary rule applied without considering the societal costs of applying the rule, such as the safety-sensitive nature of Ahart and McWhirter's employment. Hence, we affirm and remand to the court of appeals to return this case to the Board for further proceedings consistent with this opinion.