2014 CO 54

**Tom FRANCEN, Petitioner**

v.

**COLORADO DEPARTMENT OF REV-ENUE, DIVISION OF MOTOR VEHICLES, Respondent.**

**Supreme Court Case No. 12SC610**

Supreme Court of Colorado.

June 30, 2014

Attorneys for Petitioner: John Scott, Attorney at Law, LLC John G. Scott, Littleton, Colorado

Attorneys for Respondent: John W. Suthers, Attorney General, Daniel D. Domencio, Solicitor General, Grant T. Sullivan, Assistant Solicitor General, Cathern H. Smith, Assistant Attorney General, Denver, Colorado

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 The Division of Motor Vehicles, a section of the Colorado Department of Revenue (the "Department"), revoked Tom Francen's driver's license, following a hearing officer's determination that Francen had driven a motor vehicle with a blood alcohol content ("BAC") in excess of the statutory maximum. *See* § 42–2–126(3)(a)(I), C.R.S. (2011). The district court reversed, holding that the initial stop of Francen's vehicle was not supported by reasonable suspicion. The court of appeals reversed the district court and held that the legality of the initial contact between the police and Francen was not relevant in the civil administrative proceeding to revoke his driver's license. The court also held that the exclusionary rule did not apply to suppress evidence of his BAC. Francen petitioned us for certiorari review.[1] We agree with the court of appeals. We hold that,

---

1. We granted certiorari to review the following issues:
    1. Whether the court of appeals erred in holding that a driver cannot rely on the exclusionary rule to raise the illegality of initial police contact as a defense in a civil driver's license revocation proceeding conducted pursuant to section 42–2–126, C.R.S. (2011).
    2. Whether the express consent statute allows the Department of Revenue to revoke a driver's license pursuant to section 42–2–126, C.R.S. (2011) on the basis of a search that itself is the product of an illegal stop and arrest, regardless of whether the exclusionary rule applies in driver's license revocation proceedings.

In addition to this case, today we also announce our companion decision in *Hanson v. Colorado Department of Revenue,* 2014 CO 55, 328 P.3d 122.

under section 42–2–126, C.R.S. (2011),[2] "probable cause" in the context of the driver's license revocation statute, as it existed at the time of the hearing in this case, refers to the quantum and quality of evidence necessary for a law enforcement officer to issue a notice of driver's license revocation, not whether the officer's initial contact with the driver was lawful. We further hold that the exclusionary rule did not apply to suppress evidence of Francen's BAC in the driver's license revocation proceeding. Accordingly, we affirm the judgment of the court of appeals.

## I.

¶ 2 In January 2010, a Littleton police officer stopped behind Francen's vehicle at a traffic light. A passenger from Francen's vehicle got out of the vehicle and attempted to contact the driver of a different vehicle. After the passenger returned to Francen's vehicle, Francen turned left through the intersection. The officer immediately pulled Francen's vehicle over. Upon approaching the window of the driver's seat and engaging with Francen, the officer noticed that Francen had a strong odor of alcohol, his eyes were bloodshot, and his speech was slurred. Francen told the officer that he had consumed three or four alcoholic beverages. The officer then had Francen perform a variety of roadside sobriety tests, which he failed. The officer arrested Francen, and after being advised of his options, Francen elected to take a breath test. The results of the test indicated Francen had a BAC of 0.115, which was in excess of the statutory 0.08 maximum. In addition to criminal citations, the officer issued Francen a civil notice of driver's license revocation.

¶ 3 Francen requested an administrative hearing, challenging the revocation of his driver's license. He sought to establish that

the officer lacked reasonable suspicion for the initial stop of the vehicle. The hearing officer declined to apply the exclusionary rule to the administrative proceeding and consequently found sufficient evidence to sustain the driver's license revocation. Francen then sought judicial review in the district court. The district court reversed the hearing officer, concluding that the initial stop was unlawful. The district court held that the hearing officer erred in considering the evidence offered by the police officer, and without that, the hearing officer concluded that the revocation was not supported by sufficient evidence.

¶ 4 The Department appealed to the court of appeals, which reversed the district court. The court of appeals held that the legality of the initial contact between Francen and the police officer was irrelevant in the administrative revocation proceeding and further held that the exclusionary rule did not apply.

¶ 5 Francen argues, as he did below, that during the administrative driver's license revocation proceeding, he should have been able to question the legality of the initial contact, and he also argues that the exclusionary rule should have applied. The Department argues that the statute governing the revocation proceeding, in effect at the time of the hearing in this case, does not permit consideration of the initial contact and asks us to decline to extend the exclusionary rule to the driver's license revocation proceeding. We agree with the court of appeals and the Department on both issues.

## II.

¶ 6 We hold that "probable cause" in the context of the driver's license revocation statute, as it existed at the time of the hearing in this case, refers to the quantum and quality of evidence necessary for a law enforcement officer to issue a notice of driver's

---

**2.** This statute was amended by the General Assembly in 2013, providing a driver the right to "challenge the validity of the law enforcement officer's initial contact with the driver...." 2013 Colo. Sess. Laws. ch. 196, §§ 1–2, H.B. 13–1077, eff. May 11, 2013 ("In Colorado Revised Statutes, 42–2–126, add (8)(h) as follows: ... 'a driver may challenge the validity of the law enforcement officer's initial contact with the driver

and the driver's subsequent arrest for DUI, DUI per se, or DWAI. The hearing officer shall consider such issues when a driver raises them as defenses.'"). Because this statutory provision was not in effect when the hearing in this case took place, we do not reach the question of whether this new statute would render a different result.

license revocation, not whether the officer's initial contact with the driver was lawful. We further hold that the exclusionary rule did not apply to suppress evidence of Francen's BAC in the driver's license revocation proceeding. Accordingly, we affirm the judgment of the court of appeals.

### A. Standard of Review

¶ 7 Judicial review of a driver's license revocation proceeding is governed by statute. *See* § 42–2–126(9)(b), C.R.S. (2013).[3] "If the court finds that the department exceeded its constitutional or statutory authority, made an erroneous interpretation of law, acted in an arbitrary and capricious manner, or made a determination that is unsupported by the evidence in the record, the court may reverse the department's determination." *Id.*

■■■ ¶ 8 In this case, we must determine whether section 42–2–126, as it existed at the time of Francen's stop, permitted a driver to introduce evidence in a driver's license revocation proceeding regarding the legality of an initial contact by a police officer. The proper construction of statutes is a question of law we review de novo. *See, e.g., Klinger v. Adams Cnty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo.2006). When construing a statute, we ascertain and give effect to the General Assembly's intent, reading applicable statutory provisions as a whole in order to accord consistent, harmonious, and sensible effect to all their parts. *People in the Interest of W.P.*, 2013 CO 11, ¶ 11, 295 P.3d 514, 519; *Moffett v. Life Care Ctrs. of Am.*, 219 P.3d 1068, 1072 (Colo.2009). We liberally construe statutes to fully carry out the General Assembly's intent. § 2–4–212, C.R.S. (2013). We read the language of a statute in context and give it the commonly accepted and understood meaning. *Crandall v. City*

*of Denver*, 238 P.3d 659, 662 (Colo.2010); *see also* § 2–4–101, C.R.S. (2013). If a statute is unambiguous, we give effect to the statute's plain and ordinary meaning and look no further. *Daniel v. City of Colo. Springs*, 2014 CO 34, ¶ 12, 327 P.3d 891 (citing *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 799 (Colo.2000)).

### B. Probable Cause for Driver's License Revocation

¶ 9 The General Assembly enacted a comprehensive administrative regime governing the revocation of driver's licenses for alcohol-related acts. The purpose was "[t]o provide safety for all persons using the highways of this state by quickly revoking the driver's license of any person who has shown himself or herself to be a safety hazard by driving with an excessive amount of alcohol in his or her body ...." § 42–2–126(1)(a), C.R.S. (2013). The purpose of the statute also includes "guard[ing] against the ... erroneous deprivation of the driving privilege by providing an opportunity for a full hearing." § 42–2–126(1)(b), C.R.S. (2013).

¶ 10 In this case we must ascertain and give effect to the statutory sanction for a licensing violation, which is distinct from any criminal penalty. A law enforcement officer is required to provide the driver with a "notice of revocation":

> [I]f the law enforcement officer determines that, based on a refusal or on test results available to the law enforcement officer, the person's license is subject to revocation for excess BAC or refusal.[4]

§ 42–2–126(5)(b)(1). Only if the police officer has "probable cause to believe that a person should be subject to license revocation" can the officer give the notice of revocation. § 42–2–126(5)(a), C.R.S. (2013). A driv-

---

**3.** Throughout the opinion, where a particular statutory section is the same in both the 2011 and 2013 version of the code, we cite to the 2013 version.

**4.** Refusal "means refusing to take or complete, or to cooperate in the completing of, a test of the person's blood, breath, saliva, or urine as required by section 18–3–106(4) or 18–3–205(4), C.R.S., or section 42–4–1301.1(2)." § 42–2–126(2)(h), C.R.S. (2013). Colorado's expressed consent law, § 42–4–1301.1, C.R.S. (2013) (for-

merly section 42–4–1202), requires an individual to take a blood or breath alcohol test if they are requested to do so by a police officer who "[has] probable cause to believe that the person [has] been driving a motor vehicle in violation of section 42–4–1301." § 42–4–1301.1(5). The General Assembly has amended portions of this statute since the facts of this case took place. However, the amendments were unrelated and immaterial to the language at issue here.

er's license is subject to revocation if "a person drove a vehicle in this state when the person's BAC was 0.08 or more at the time of driving or within two hours after driving." § 42–2–126(2)(b), C.R.S. (2013).

¶ 11 After giving the driver the notice of revocation, "the law enforcement officer shall forward to the department an affidavit containing information relevant to the legal issues and facts that shall be considered by the department to determine whether the person's license should be revoked . . . ." § 42–2–126(5)(a). A driver can then request a hearing to contest whether his or her driver's license should be revoked. § 42–2–126(7)(a), C.R.S. (2013). "The department shall consider all relevant evidence at the hearing, including the testimony of any law enforcement officer and the reports of any law enforcement officer that are submitted to the department." § 42–4–126(8)(c), C.R.S. (2013). After the driver is given a full hearing, the Department must make a final ruling on the revocation. § 42–2–126(8)(d)(X), C.R.S. (2013). If the driver's license is revoked, the driver can seek judicial review. § 42–2–126(9)(a), C.R.S. (2013).

¶ 12 Interpreting the language of the statute in light of the General Assembly's intent, we conclude that the legality of the initial stop of the driver by the police officer is irrelevant for the purpose of determining whether to sustain the revocation of a driver's license under section 42–2–126, as it existed at the time of the hearing in this case. Some panels of the court of appeals have held that a driver may raise the legality of the initial police contact as a defense in administrative revocation proceedings because of the "probable cause" language in both the expressed consent statute and the license revocation statute, holding that this language implies lawful initial contact. *See, e.g., Baldwin v. Huber*, 223 P.3d 150, 152 (Colo.App.2009); *Peterson v. Tipton*, 833 P.2d 830, 831 (Colo.App.1992); *Wallace v. Dep't of Revenue*, 787 P.2d 181, 182 (Colo. App.1989). We disagree.

¶ 13 The statute's language requires that the police officer initiate the driver's license revocation proceeding if the officer "has probable cause to believe that a person should be subject to license revocation for excess BAC or refusal." § 42–2–126(5)(a). A person is subject to driver's license revocation if they "drove a vehicle in this state when the person's BAC was 0.08 or more at the time of driving or within two hours after driving." § 42–2–126(2)(b), (3)(a)(I). The legality of the initial stop by the police officer is relevant in a criminal prosecution for determining whether the arrest was proper.[5] *See People v. Brown*, 217 P.3d 1252, 1256 (Colo.2009).

¶ 14 "Probable cause" in the driver's license revocation context refers to the quantum and quality of evidence known to the officer regarding whether the driver has driven a vehicle in Colorado "when the person's BAC was 0.08 or more at the time of driving or within two hours after driving." *See* § 42–2–126(2)(b), (3)(a)(I); *see also Black's Law Dictionary* 1321 (9th ed. 2009) (defining probable cause as "[a] reasonable ground to suspect that a person has committed or is committing a crime"). We have previously explained that "probable cause is held to exist where the facts and circumstances within the officer's knowledge and of which he has *reasonably trustworthy information* are sufficient to cause a reasonably cautious police officer to believe that an offense has been committed." *Colo. Dep't of Rev. v. Kirke*, 743 P.2d 16, 18 (Colo.1987) (emphasis in original) (quoting *People v. Nanes*, 174 Colo. 294, 483 P.2d 958, 961 (Colo.1971)). In fact, the court of appeals' majority opinion in *Francen* correctly noted that the General Assembly frequently uses "probable cause" in this way. *See, e.g.,* § 10–4–418(1), C.R.S. (2013). This is only a threshold question regarding whether there is sufficient evidence to initiate the proceedings.

---

5. We note that the General Assembly, in related criminal statutes, has specifically required that the police officer's initial contact be lawful. § 42–4–1301(6)(i)(I), C.R.S. (2013). However, the driver's license revocation proceedings specifically contain a provision distinguishing the criminal and civil proceedings, § 42–2–126(6)(a), C.R.S (2013), and we decline to apply the criminal law requirements in the administrative revocation proceeding context.

¶ 15 Our interpretation of "probable cause" in the driver's license revocation statute as referring to the quantum and quality of evidence to sustain the license revocation is buttressed by the applicable legal standard for whether the stop of a vehicle was constitutional. Law enforcement officers do not need probable cause to perform investigatory stops. *See Brown*, 217 P.3d at 1256. Instead, an officer only need possess "articulable reasonable suspicion" to make an investigatory stop of a vehicle and then "[p]robable cause to arrest an individual for driving under the influence. . . ." *Id.* In using the term probable cause in the license revocation statute, we do not read the words of the statute as evidencing the General Assembly's intent to raise the legal standard for making an investigatory stop from articulable reasonable suspicion to probable cause. Instead, we interpret "probable cause" to mean what it plainly said, that a law enforcement officer should issue a notice of driver's license revocation when supported by the officer's reasonable belief that the driver had excess BAC or had improperly refused a BAC test.

¶ 16 Granted, probable cause is required to arrest an individual for driving under the influence. *Id.* However, a driver's license revocation proceeding is not contingent on the driver having been arrested for driving under the influence of drugs or alcohol. An earlier version of both the expressed consent statute and the driver's license revocation statute required a valid arrest to precede an officer's notice of driver's license revocation. The earlier version of the license revocation statute stated in part: "A law enforcement officer who arrests any person for a violation of" Colorado's expressed consent statute must complete the appropriate license revocation documentation for the Department. § 42–2–122.1(2)(a), C.R.S. (1984). Likewise, the earlier version of the expressed consent statute stated in part: "Any person who drives any motor vehicle . . . throughout this state may be required to submit to a chemical test of his breath or blood for the purpose of determining the alcoholic content of his blood or breath, if arrested for any misdemeanor offense arising out of acts alleged to have been committed . . . ." § 42–4–1202(3)(a)(II), C.R.S. (1984). Subsequent amendments in 1989, however, struck the prerequisite arrest requirement from both statutes, § 42–2–122.1(2)(a), C.R.S. (1989); § 42–4–1202(3)(a)(II), C.R.S. (1989), such that a police officer may give a notice of revocation "[w]henever a law enforcement officer has probable cause to believe that a person has violated" the law by either failing or refusing to take a breath or blood alcohol test. § 42–2–122.1(2)(a), C.R.S. (1989).

¶ 17 The probable cause language present in sections 42–2–126 and 42–4–1301.1 is unambiguous in referring to the threshold standard for issuance of the notice of the driver's license revocation proceeding. The language of the statute simply does not address the legality of the initial contact, and the Department's determination was to proceed on evidence establishing either excess BAC or refusal.

## C. The Exclusionary Rule is Inapplicable to Driver's License Revocation Proceedings

¶ 18 Francen argues that even if the legality of the initial contact is irrelevant for the purpose of a driver's license revocation proceeding, any evidence that was obtained illegally should be excluded under the exclusionary rule. As a result, he argues, there would not have been sufficient evidence here to sustain the revocation of his driver's license.

¶ 19 The application of the exclusionary rule in the context of civil proceedings is a question of law, which we review de novo. *Ahart v. Colo. Dep't of Corr.*, 964 P.2d 517, 520 (Colo.1998) (holding that we review agency determinations of law de novo); *Charnes v. Lobato*, 743 P.2d 27, 32–33 (Colo. 1987). The exclusionary rule is a judicially created sanction, intended to deter illegal police activity by excluding evidence at trial that was obtained pursuant to unconstitutional searches and seizures. *United States v. Janis*, 428 U.S. 433, 446–47, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

¶ 20 This rule is routinely applied in criminal prosecutions, but its use in civil proceedings is restricted. *Id.* The United States Supreme Court held in *Janis* that the exclusionary rule should not apply in civil proceed-

ings if it "has not been shown to have a sufficient likelihood of deterring the conduct of the state police so that it outweighs the societal costs imposed by the exclusion." *Id.* at 454, 96 S.Ct. 3021; *Penn. Bd. of Probation & Parole v. Scott,* 524 U.S. 357, 362–63, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998). In interpreting and applying *Janis,* we further explained in *Ahart* that the "assessment of the deterrent benefits requires a fact-specific analysis that usually involves two considerations: (1) whether the illegal agency conduct is inter-sovereign or intra-sovereign; and (2) whether the proceedings may be characterized as quasi-criminal." 964 P.2d at 520 (internal quotations omitted). Neither prong is dispositive. *Id.* at 521.

¶ 21 In Ahart, we examined whether the exclusionary rule should apply during employee termination proceedings. *Id.* In that case, two correctional officers were asked to submit to drugs tests by the Department of Corrections, and an administrative law judge found that the employer lacked reasonable suspicion to require the test. *Id.* at 519–20. There, we first concluded that the conduct was intra-sovereign. *Id.* at 522. However, as to the second *Ahart* prong, we agreed with the administrative law judge and held that the main purpose of the proceeding was to determine whether the employees possessed the requisite qualifications to be correctional officers given "the security and safety-sensitive nature" of being employed as a correctional officer, even if there was a punitive element to the employee termination proceeding. *Id.* at 522–23. We concluded that the proceeding was not quasi-criminal in nature. *Id.* at 523. After balancing all of the factors, we declined to extend the exclusionary rule to the employee termination proceeding under the balancing test. *Id.*

¶ 22 In this case, we conclude that the agency conduct here is inter-sovereign. Conduct is inter-sovereign when the agency that committed the violation is not the same entity seeking to introduce the evidence. *Id.* at 520. The police officer who stopped Fran-

cen's car was employed by the Littleton Police Department, a municipal agency. The Division of Motor Vehicles—which sought to use the evidence of the BAC procured by the police officer—is a state entity tasked with regulating Colorado's motor vehicles and drivers. While Francen asks us to consider as "inter-sovereign" only conduct that involves a federal versus a state entity, we instead follow the direction from *Ahart,* which contemplated a distinction between the functions the agencies serve under the statutory scheme at issue in the given case.[6]

¶ 23 Here, the Littleton Police Department is a municipal department tasked with enforcing state and federal criminal laws. In contrast, the Division of Motor Vehicles is a civil administrative agency responsible for the management of our roadways. For instance, it ensures that all drivers are licensed, § 42–2–101, C.R.S. (2013), and all vehicles are safely equipped for travel, §§ 42–4–201 to 241, C.R.S. (2013). While both the Littleton Police Department and the Division of Motor Vehicles are state agencies, they are distinct in operation and purpose. To be sure, the Littleton Police Department is involved in some of the operations of the Division of Motor Vehicles. As we discussed above, the law enforcement officers are responsible for initiating the administrative driver's license revocation proceeding by both providing the driver with a notice of revocation and by submitting an affidavit to the Division of Motor Vehicles. Francen argues that this relationship is enough to make this conduct intra-sovereign, rather than inter-sovereign. We disagree.

¶ 24 The relationship between the police officers and the Division of Motor Vehicles is simply one of legislatively chosen convenience, not responsibility. The entities are not accountable to each other, and any deterrent effect from enforcing the exclusionary rule against one is unlikely to impact the actions of the other. Police officers are responsible for enforcing the criminal laws that

6. In *Ahart,* we concluded that the conduct was intra-sovereign because the Department of Corrections was both the offending agency and the agency that sought to use the evidence. Had we intended *Ahart* to stand for the proposition that

the inquiry only requires a determination of federal versus state, we would have said that the offending sovereign was a Colorado entity and that a Colorado entity sought to use the evidence.

prohibit persons from driving a vehicle while intoxicated. As such, they patrol the roadways, and they investigate evidence of criminal activity. Given that the police officers are already tasked with enforcing the criminal laws, the General Assembly determined that they are best suited to notify the Department that the licensing laws have been violated. The statutory use of that overlap in section 42–2–126 does not alter the fact that the police officers are primarily tasked with executing the criminal laws and that the enforcement of the state's civil licensing laws is a secondary consideration.

¶ 25 However, even assuming *arguendo* that the conduct in this case is intra-sovereign rather than inter-sovereign, our inquiry would not be complete. In *Ahart*, we concluded that the conduct was intra-sovereign, but we still went on to hold that the exclusionary rule should not apply because the proceeding was not quasi-criminal and the deterrent benefits of the exclusionary rule in that case did not outweigh the societal costs. 964 P.2d at 523.

¶ 26 As we did in *Ahart*, we conclude that the proceeding here is not quasi-criminal in nature. A proceeding is quasi-criminal if it provides for punishment, but is civil in form. *Id.* at 520. "The more similar the objective of a civil proceeding to the purpose of criminal proceedings—punishment for violations of the law—the more likely exclusion of the evidence will foster deterrence." *Id.* In this case, the relevant statute specifically distinguishes the driver's license revocation proceeding from any related criminal proceeding. It explains, "The determination of these facts by the department is independent of the determination of a court of the same or similar facts in the adjudication of any criminal charges arising out of the same occurrence. The disposition of the criminal charges shall not affect any revocation under this section." § 42–2–126(6)(a).

¶ 27 Like the employee termination proceeding in *Ahart*, the proceeding here has multiple purposes, as evidenced by the legislative declaration in sections 42–2–126(1)(a)–(b). First, the proceeding is aimed at ensuring hazardous drivers are swiftly removed from the roadways. Second, the proceeding

protects against an erroneous deprivation of the driving privilege. However, "[l]icense revocation proceedings are civil in nature; the protections afforded criminal defendants do not apply. The purpose of a revocation hearing is to determine if, notwithstanding the violation, the licensee should be allowed the use of the public highways." *Kirke*, 743 P.2d at 20; *see also Charnes v. Olona*, 743 P.2d 36, 38 (Colo.1987) ("[R]evocation hearings are civil proceedings . . . ."). While revoking a driver's license surely is a sanction for the driver, the General Assembly did not intend for that to be this section's main purpose. The statute expressly considers a driver's license to be a "privilege." *See Deutschendorf v. People*, 920 P.2d 53, 60 (Colo.1996) (holding that a "sanction which constitutes the revocation of a privilege voluntarily granted is characteristically free of the punitive criminal element"). To ensure that this privilege is not erroneously deprived, drivers are entitled to a "full hearing." This sanction is certainly a purpose of the proceeding, but it "is a remedial, rather than a punitive sanction." *See id.*

¶ 28 Instead, the main purpose of section 42–2–126 is "[t]o provide safety for all persons using the highways of this state by quickly revoking the driver's license of any person who has shown himself or herself to be a safety hazard . . . ." *See* § 42–2–126(1)(a). The Department ensures that the roadways in Colorado are safe for the public by removing hazardous drivers from the roads. This distinct purpose is especially true given the different and expansive criminal regime, which punishes this same conduct with criminal penalties. Whether a criminal penalty is required for a particular driver is simply irrelevant for the Department. In fact, the revocation of a driver's license is not even tied to an arrest or conviction for a criminal offense. Instead, the Department is required to revoke a driver's license if a law enforcement officer has probable cause to believe that the driver operated a vehicle with a BAC in excess of 0.08 or violated the expressed consent law. We conclude that the primary purpose of section 42–2–126 is to ensure safe roads and highways in Colorado and not to punish hazardous drivers.

¶ 29 Given that this case involves inter-sovereign agency conduct and the proceeding is not quasi-criminal in nature, we conclude that any deterrent effect will be minimal and does not outweigh the substantial societal costs. We join the majority of other states that have concluded that any benefit of extending the exclusionary rule to driver's license revocation proceedings does not balance against the substantial cost of keeping hazardous drivers on the roadways.[7] The state has a strong interest in maintaining safe roads and highways, and this necessarily includes keeping those who have shown themselves to be hazardous drivers off the road. Applying the exclusionary rule here would only ensure that hazardous drivers continue to endanger the public, with minimal deterrent effect. Further, any deterrent effect on the police possible in this context would be marginal given that the exclusionary rule would already render this evidence inadmissible in a criminal prosecution. Therefore, we hold that the exclusionary rule is inapplicable in driver's license revocation proceedings.

### D. Application to this Case

¶ 30 In this case, Francen complied with the expressed consent law and submitted to a breath test. The results of the test showed that Francen operated a vehicle with a BAC of 0.115. On the basis that probable cause existed to believe that Francen had operated a vehicle with a BAC in excess of 0.08, the police officer provided Francen with a notice of revocation and submitted a corresponding affidavit to the Department.

¶ 31 Because we conclude that the legality of the initial stop was irrelevant under the statute that was in effect at the time of Francen's hearing, we hold that he was not entitled to present evidence and that the

Department was not required to consider evidence regarding whether the initial contact was legally valid. We also conclude that applying the exclusionary rule in a driver's license revocation proceeding would effect a substantial societal cost without a sufficient resulting benefit. As such, the BAC evidence procured by the police officer was not subject to the exclusionary rule in the driver's license revocation proceeding, and the Department properly considered it as relevant evidence in determining whether Francen's driver's license should be revoked.

### III.

¶ 32 Accordingly, we affirm the judgment of the court of appeals.

JUSTICE HOOD dissents.

JUSTICE HOOD, dissenting.

¶ 33 Consider how the General Assembly reacted to the court of appeals' decision in this case. To correct what the bill sponsor termed the "judicial quagmire" created by that decision, it swiftly amended the license revocation statute to make clear that drivers may challenge the legality of the police's initial contact:

[A] driver may challenge the validity of the law enforcement officer's initial contact with the driver and the driver's subsequent arrest for DUI, DUI per se, or DWAI. The hearing officer shall consider such issues when a driver raises them as defenses.

See § 42–2–126(8)(h), C.R.S. (2013); see also Hearing on H.B. 13–1077 Before the H. Judiciary Comm., 69th Gen. Assemb., 1st Sess. (Feb. 5, 2013) (statement of Rep. Salazar, bill sponsor).

¶ 34 The majority acknowledges this amendment but otherwise declines to ad-

7. See, e.g., Nevers v. State, Dep't of Admin., 123 P.3d 958, 963–64 (Alaska 2005); Fishbein v. Kozlowski, 252 Conn. 38, 743 A.2d 1110, 1117–18 (1999); Martin v. Dep't of Rev., 285 Kan. 625, 176 P.3d 938, 948–53 (2008); Powell v. Sec'y of State, 614 A.2d 1303, 1305–07 (1992); Riche v. Dir. of Rev., 987 S.W.2d 331, 333, 336 (Mo. 1999); Chase v. Neth, 269 Neb. 882, 697 N.W.2d 675, 684–85 (2005); Lopez v. Dir., Div. of Motor Vehicles, 145 N.H. 222, 761 A.2d 448, 450 (2000); Commonwealth of Penn., Dep't of Transp.

v. Wsyocki, 517 Pa. 175, 535 A.2d 77, 79 (1987); Beller v. Rolfe, 194 P.3d 949, 951–52 (Utah 2008); Tornabene v. Bonine ex rel. Ariz. Highway Dep't, 203 Ariz. 326, 54 P.3d 355, 362–63 (App. 2002); see also Thomas M. Fleming, Admissibility, in Motor Vehicle License Suspension Proceedings, of Evidence Obtained by Unlawful Search and Seizure, 23 A.L.R.5th 108, § 3 (orig. pub. in 1994) (explaining that the majority of courts have declined to apply the exclusionary rule in driver's license revocation proceedings).

dress it, correctly noting that it did not exist at the time of Francen's hearing. Maj. op. ¶ 1 n. 2. That is true (because the amendment was a "legislative fix" to correct the court of appeals' decision in *Francen, see Hearing on H.B. 13–1077*, (statement of Rep. Salazar, bill sponsor)), but I disagree that the amendment is totally irrelevant to the statutory interpretation question now before us.

¶ 35 As with all such questions, our job is to discern and give effect to the General Assembly's intent. *Nowak v. Suthers*, 2014 CO 14, ¶ 20, 320 P.3d 340, 344. That intent, according to the majority, is clear from the old revocation statute's plain language: "[It] simply does not address the legality of the initial contact." Maj. op. ¶ 17. By requiring "probable cause," the majority reasons that the General Assembly intended to refer only to the "quantum and quality" of evidence necessary to sustain revocation. *Id.* at ¶ 14.

¶ 36 Yet that interpretation is new. For years, divisions of the court of appeals agreed that the statute's "probable cause" requirement implied a lawful stop. *See, e.g., Peterson v. Tipton*, 833 P.2d 830, 831 (Colo. App.1992) (holding that a police officer may not direct a driver to submit to alcohol testing absent "probable cause" and, by implication, "reasonable suspicion for the initial stop"); *see also Baldwin v. Huber*, 223 P.3d 150, 152 (Colo.App.2009) (evaluating whether the initial stop was lawful under the reasonable suspicion standard); *Wallace v. Dep't of Revenue*, 787 P.2d 181, 182–83 (Colo.App. 1989) (concluding, under an old statutory scheme, that the initial stop was "justified under the reasonable suspicion standard"). Despite this string of contrary authority, the majority now deciphers the General Assembly's original intent from the plain meaning of what it considers to be an unambiguous statute.

¶ 37 But I am not persuaded that this statute—the plain meaning of which has escaped several judges on the court of appeals and now me—is as clear as the majority thinks. The majority purports to apply the statute as written by giving "probable cause" its dictionary definition: "A reasonable ground to suspect that a person has committed or is committing a crime." Maj. op. ¶ 14

(quoting *Black's Law Dictionary* 1321 (9th ed. 2009)). A dictionary definition, divorced from the context and purpose in which that term is used, generally is a blind guide: "[P]recise meaning embodying legislative intent must often be determined by reference to [these] other considerations." *Marquez v. People*, 2013 CO 58, ¶ 8, 311 P.3d 265, 268.

¶ 38 Consider the context in which the "probable cause" requirement appears and its purpose. It appears after "law enforcement officers" and serves to restrain their actions: only "law enforcement officers" with "probable cause" may file revocation complaints. *See* § 42–2–126(5)(a). It would make little sense to restrain police behavior by imposing a probable cause requirement that can be satisfied with illegally obtained evidence. If the General Assembly intended to allow probable cause to be established through the fruits of an illegal stop, why would it use the term "probable cause" at all? It could have just as easily described the "quantum and quality" of evidence necessary to file a revocation complaint without importing a Fourth Amendment concept that requires reasonable—and, necessarily, lawfully obtained—grounds.

¶ 39 I agree that the term "probable cause" may refer only to the evidence necessary to sustain revocation. But it could also mandate that the evidence was lawfully obtained. Because "the words chosen by the legislature are unclear" and "are susceptible to multiple reasonable, alternative interpretations," I would resort to extrinsic aids of interpretation. *See In re Interest of O.C.*, 2013 CO 56, ¶ 13, 308 P.3d 1218, 1221. Here, legislative history is most helpful.

¶ 40 For years, the General Assembly appeared to accept the interpretation the majority today rejects. As Judge Taubman noted in his dissent to *Francen*, it revised the express consent statute ten times since *Peterson* but never corrected what the majority now concludes was an erroneous interpretation all along. *See Francen v. Colo. Dep't of Revenue*, 2012 COA 110, 61, —— P.3d —— (Taubman, J., dissenting). Legislative inaction may be "a poor beacon to follow" because it does not necessarily suggest that a later legislative body agrees with an earlier

judicial interpretation. *See Zuber v. Allen,* 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). For example, that legislative body may be unaware of the interpretation, or individual legislators may decide that correcting it is not worth the effort. But we have endorsed this interpretative technique in the recent past. *See Bd. of Cnty. Comm'rs v. Colo. Pub. Utils. Comm'n,* 157 P.3d 1083, 1089 (Colo.2007) ("[L]egislative inaction to change this court's interpretation of a statute is presumed to be ratification of that interpretation."). If appropriate in some cases, this case provides an ideal example of when to rely on it. Here, we have years of legislative inaction after *Peterson*'s interpretation of the old revocation statute, followed by a prompt legislative response to fix *Francen*'s erroneous interpretation. Put in that perspective, that legislative inaction seems imbued with greater significance.

¶ 41 Of course, the response to my relying on a later amendment to interpret an old statute is that it tells us "virtually nothing" about the enacting legislature's original intent. *See Union Pac. R.R. Co. v. Martin,* 209 P.3d 185, 188–89 (Colo.2009). Even if that is true, the amendment can tell us what the amending legislature thinks the enacting legislature was trying to say. And where, as here, the amending legislature declares what it thinks an older statute was intended to mean, nothing stops us from considering that declaration as persuasive authority.

¶ 42 And we should consider it as persuasive authority in this case for two reasons. First, the General Assembly is "best positioned to ascertain [this] statute's most desirable construction." *See* 2B Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 49:10, at 135 (7th ed. 2012). The most desirable construction of this statute depends on which of its purposes is emphasized, and our decision to emphasize one purpose over the other is fraught with policy implications the General Assembly is better positioned to weigh.

¶ 43 On the one hand, the revocation scheme is meant to provide a mechanism for "quickly revoking" driver's licenses. § 42–2–126(1)(a). The majority's construction furthers this purpose because the administrative hearing process will not be burdened with suppression issues. On the other hand, the scheme is also meant to "guard against the potential for any erroneous deprivation of the driving privilege" by providing an opportunity for a "full hearing." § 42–2–126(1)(b). My interpretation would further this purpose because it guards against "erroneous" revocations by permitting defendants to raise suppression issues during revocation hearings. Both interpretations affect the complexity of these administrative hearings and the costs associated with conducting them. The General Assembly has made its policy choice clear, and it seems appropriate to honor that decision.

¶ 44 Second, "permitting a subsequent enactment to control the original statute's doubtful meaning is an efficient way to remove legal uncertainties and settle expectations." *See* 2B Singer & Singer, *Statutes and Statutory Construction* § 49:10, at 135. As it stands now, the majority perpetuates the "judicial quagmire" that the General Assembly was attempting to fix in the first place. There are now a few defendants, like Francen, who will not be able to challenge the legality of the initial police contact, despite the fact that every defendant after *Peterson* was permitted to do so and every defendant falling under the amended statutory scheme will be able to do so too. It depends entirely on when the hearing has taken place. That is the result the majority concludes that the General Assembly must have intended, and yet it seems contrary to what the General Assembly is actually trying to accomplish.

¶ 45 Like the majority, I strive to give statutes their plain and ordinary meaning whenever possible. *See, e.g., Nowak,* ¶¶ 22–24, 320 P.3d at 345. But, in my view, the majority interprets what it considers to be unambiguous language to avoid the significance of the General Assembly's legislative response to the *Francen* division's holding.

¶ 46 Because I would reverse the court of appeals on the merits, I do not address whether the exclusionary rule is an appropriate remedy in this context.

¶ 47 For these reasons, I respectfully dissent.